Fe Castro MARCHISHECK,
Plaintiff–Appellant,

v.

SAN MATEO COUNTY and Does
1 through 10, Defendants–
Appellees.

No. 98–16141.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1999.

Decided Dec. 16, 1999.

Crisostomo G. Ibarra, Law Offices of Crisostomo G. Ibarra, San Francisco, California, for the plaintiff-appellant.

A. Robert Singer and Craig P. Tanner, Hassard Bonnington, San Francisco, California, for the defendants-appellees.

Before: CANBY, HALL, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

This appeal arises under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601–2654, and the California Family Rights Act (CFRA), Cal. Gov't Code §§ 12945.1 to .2, 19702.3. Plaintiff Fe Castro Marchisheck contends that defendant San Mateo County violated those statutes when it terminated her employment after she took a one-month unauthorized leave from work to move her teenage son to the Philippines. The district court granted Defendant's motion for summary judgment. On de novo review, *see Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998), we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We view the facts in the light most favorable to Plaintiff, the nonmoving party. *See id.* Plaintiff was employed as a senior medical technologist in the San Mateo County General Hospital. She has a son, Shaun. At the time of the key events in this case, Shaun was 14 years old. Plaintiff was raising him alone.

Shaun had received counseling beginning in 1991. Following a 1991 arrest for shoplifting, Shaun was counseled by Dr. Rath at Project Focys. Dr. Rath concluded that Shaun, then 10, was mildly depressed and had poor peer relations. Shaun received counseling at Kaiser in 1994. He had 10 counseling sessions in 1995 with Mariana Pavolotsky, an intern at Project Focys. Plaintiff, who was concerned about Shaun's grades and choice of friends, initiated those sessions. After the final session, on June 1, 1995, Pavolotsky did not refer Shaun for continued therapy. Her records from their sessions do not contain any diagnosis of a mental disorder, though they do reflect her concern with Shaun's behavioral problems. Dr. Rath, who was Pavolotsky's supervisor, stated in

a deposition that he did not recollect "having a big serious concern at that point" about Shaun's behavior and also stated that, if Pavolotsky "felt like there was something gravely needing attention, then there would have been probably significant attempts to try to get him to continue in therapy."

Shaun also attended six counseling sessions with Jerry Lawler at Kaiser between June 2 and August 9, 1995. Lawler was a "psychological assistant" in the drug and alcohol abuse program at Kaiser. Plaintiff brought Shaun to Kaiser because she was concerned that he was abusing alcohol and drugs. Lawler came to a "provisional" conclusion during counseling that Plaintiff's concerns were unfounded. He diagnosed Shaun with a "parent-child relationship problem" but "ruled out" diagnoses of attention deficit disorder and post-traumatic stress disorder.

On the night of August 5, 1995, Shaun was assaulted by several acquaintances. Plaintiff took Shaun to the emergency room when she arrived home from work on August 6. The emergency room report states that Shaun lost consciousness during the attack and suffered a nasal contusion, two puncture burns on his back, abrasions, erythema on the right side of his neck, and a left lateral subconjunctival hemorrhage. The report also states that Shaun was "alert and oriented" and "feel[ing] remarkably well." He was sent home with instructions to apply ice to his nose, clean his wounds with soap and water, and return to the emergency room if his wounds became more red, swollen, or tender or if he developed a fever. The report does not recommend any restriction of Shaun's activities.

Concerned for Shaun's safety, Plaintiff took him to stay with his sister. Shaun stayed with his sister from August 7 to 17. According to his sister, Shaun was "lethargic," "jittery," and "in an obvious state of fear," and he "mostly laid on the couch" and did not shower or bathe.

On August 9, Shaun attended a previously scheduled counseling session with Lawler at Kaiser. Lawler noticed that Shaun had a black eye and asked him what happened. According to Lawler, Shaun "said 'I got into a ruckus' or something like that with somebody, but clearly he wanted it to be no big deal." Lawler stated that Shaun did not tell him of any physical problems from the assault, other than the black eye, that Lawler observed no such problems, and that Shaun expressed no fear for his safety but, "on the contrary," "minimized it."

Immediately after Shaun was assaulted, Plaintiff conceived a plan to move Shaun to the Philippines to live with her brother. Plaintiff was born in the Philippines; Shaun was not, although he had visited there. On August 10, Plaintiff made a written request for approximately five weeks of vacation leave, to begin on August 18. A supervisor, George Ford, denied the request, because he could not cover the shifts that Plaintiff would miss without authorizing overtime. Plaintiff's written request does not specify the reason for the vacation, but Plaintiff asserts that, when Ford denied her request, she told him that she had to go to the Philippines because of an "emergency" involving Shaun. That "emergency" was her fear for Shaun's safety; Plaintiff feared that if she left Shaun alone, he would be beaten or killed, and she believed that he would be safe from "getting beaten up again" if he moved to her brother's house in the Philippines.

Plaintiff had further discussions about her travel plans over the next week. Apparently Plaintiff already had bought airplane tickets, or was in the process of buying tickets, when she requested vacation leave on August 10. She spoke with another supervisor, Elaine Phelps, on August 11. Phelps, who had heard that Plaintiff already had tickets, warned Plaintiff not to leave without approval. On August 16, Ford left a message on Plain-

tiff's answering machine, reminding her that her request had been denied.

On August 17, the day on which she was scheduled to leave for the Philippines, Plaintiff met with Ford, Phelps, and Lola Thompson, the Assistant Administrator of the hospital, to discuss her vacation request. That morning, before the meeting, she called Kaiser in the hope of obtaining a letter from a doctor supporting her request for leave. Plaintiff spoke to a psychiatrist, Dr. Solomon. Plaintiff had not met Solomon, and Solomon had not been involved in any way in Shaun's counseling. Plaintiff approached him as follows: "I said [to] Dr. Solomon, I said, 'I have a son, Shaun Marchisheck, that Dr. Lawler had seen, and I would like to take my son to the Philippines, to look for a school and, you know, look for a school and housing facilities.' So I said 'If you could kind of help me out because I am having a hard time getting time off.' "

Solomon, whose practice focused on adult patients and who had limited experience treating adolescents, consulted Shaun's chart and agreed to write a letter. In his deposition, Solomon displayed almost no recollection of his contact with Plaintiff. He apparently spoke briefly with two doctors who had been involved with Shaun, but stated that he had little "participation" in their conversation about Shaun. He believed at the time that Plaintiff intended to stay in the Philippines with Shaun. In any event, he dictated the following letter for Plaintiff:

> Fe Marchisheck's son Shawn [sic] is under treatment here in our department, and at this point it is necessary for his continued treatment for him to move back to the Philippines for a time. It is also necessary for his mother to accompany him to arrange housing, schooling, etc. I would therefore greatly appreciate it if you could help in excusing her from work during this time for this family medical crisis.

Although the letter mentions "continued treatment," Solomon had "no information" about any treatment that Shaun would receive in the Philippines; nor could he have, as Plaintiff admitted in her deposition that she had no plans for Shaun to see any kind of doctor after he moved overseas. Solomon also stated that he was not sure what he was referring to when he described a "family medical crisis" and that he did not recall whether he actually had drafted the letter himself.

Plaintiff presented Solomon's letter at her August 17 meeting with Ford, Phelps, and Thompson. Despite the letter, Plaintiff's request for leave was denied. However, Plaintiff was given two other options: Taking five weeks off at the end of September, or taking two weeks off after Labor Day. Plaintiff rejected those options, in part because she already had purchased airplane tickets and could not afford to purchase new tickets. Plaintiff took Shaun to the Philippines that night.

On September 7, Ford sent Plaintiff a letter expressing Defendant's intent to terminate Plaintiff on September 20, for insubordination and absence without leave. In that letter, Plaintiff was given the opportunity to respond to the statements in the letter, either orally or in writing. She did so in a September 21 meeting before Paz Beegle, Director of Psychiatric Emergency Services. At that meeting, Plaintiff was represented by union representative Nadia Bledsoe. After the meeting, Beegle issued a document stating that the disciplinary action against Plaintiff was proper.

Defendant fired Plaintiff by letter on September 22. In that letter, Defendant noted that Plaintiff had 14 days to appeal her termination.

Plaintiff's union filed a grievance on her behalf on October 3, 1995. On November 14, Plaintiff met with her union representative, Bledsoe, and an AFSCME union lawyer, Joseph Colton, to discuss her case. Colton concluded that Plaintiff did not have grounds for a grievance, but suggested that she speak to someone at the United States Department of Labor about

whether there were grounds to charge Defendant with violating the FMLA. On December 11, Plaintiff and Bledsoe met with Dante De Tablan, an investigator with the Department of Labor's Wage and Hour Division. After reviewing Plaintiff's case, De Tablan concluded that there were not sufficient grounds to charge Defendant with violating the FMLA. At that point, Bledsoe concluded that there was an insufficient basis for Plaintiff's grievance and informed Plaintiff that the union no longer would represent her.

On February 6, 1996, Plaintiff, who by then was represented by counsel, requested an appeal before the Civil Service Commission. That request was denied because it was untimely.

Plaintiff then filed an FMLA/CFRA claim with the San Mateo County Board of Supervisors on March 6, 1996. County counsel requested a Medical Certification regarding Shaun's alleged "serious health condition" and provided Plaintiff's counsel with a copy of the California Medical Certification form. Plaintiff did not reply and never returned the form. On May 24, 1996, the Board of Commissioners rejected Plaintiff's claim.

Plaintiff filed a complaint in district court on November 26, 1996, alleging five claims for relief. Two of those claims were under the FMLA, two were under the CFRA, and one alleged "Termination in violation of Public Policy." All turned on Plaintiff's underlying assertion that she was entitled to take leave under the FMLA and CFRA to "care for" Shaun, who was suffering from a "serious health condition."

The parties filed cross-motions for summary judgment. The district court granted Defendant's motion on the ground that "the undisputed evidence establishes that, during the time period at issue in this case, Plaintiff's son, Shaun, did not have a serious medical condition which would allow Plaintiff to claim the protections of the FMLA and the CFRA." Plaintiff brought this timely appeal.

## DISCUSSION

### A. General Statutory and Regulatory Requirements

Plaintiff contends that she was discharged in violation of the FMLA and the CFRA, because she was entitled to take leave to "care for" Shaun, who was suffering from a "serious health condition." [1] The FMLA entitles employees to take 12 weeks off from work, without pay, "[i]n order to *care for* the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a *serious health condition*." 29 U.S.C. § 2612(a)(1)(C) (emphasis added). The CFRA contains a parallel provision. *See* Cal. Gov't Code § 12945.2(c)(3)(B). [2]

The FMLA defines a "serious health condition" as

an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

and reports that do not purport to discuss Shaun's condition during the relevant period.

---

1. The issue in this case pertains to Shaun's condition at the time Plaintiff requested leave. Plaintiff provides us with a number of doctors' reports that, she argues, support her view of this case. Some of those reports were presented to the district court in a timely manner; others, however, were untimely and are not part of the summary judgment record. Some discuss Shaun's condition in August 1995; some discuss his condition at other times. We decline to consider reports that are not part of the summary judgment record

2. Plaintiff's CFRA claims turn on the FMLA's definitions of "serious health condition" and "care for." The CFRA incorporates those definitions by reference, *see* Cal.Code Regs., tit. 2, § 7297.0, and Plaintiff makes no separate argument under the CFRA. Accordingly, we address Plaintiff's FMLA and CFRA claims together.

29 U.S.C. § 2611(11). Shaun did not receive inpatient care; if he had a "serious health condition," it was because he had a condition that involved "continuing treatment by a health care provider" under 29 U.S.C. § 2611(11)(B).

■ The requirements for a condition that involves "continuing treatment by a health care provider" are set out in the Department of Labor's rules implementing the FMLA.[3] Broadly speaking, and with exceptions that do not apply here, those rules require *either* (1) a *period of incapacity* of at least three consecutive days *and* (2) *treatment two or more times* by a health care provider, *see* 29 C.F.R. § 825.114(a)(2)(i); *or* (1) a *"chronic serious health condition"* (2) that results in a *period of incapacity.* 29 C.F.R. § 825.114(a)(2)(iii) (emphasis added). The rules define "incapacity" as *"inability to work, attend school or perform other regular· daily activities* due to the serious health condition, treatment therefor, or recovery therefrom." 29 C.F.R. § 825.114(a)(2)(i) (emphasis added).

### B. *"Serious Health Condition"*

Plaintiff does not identify clearly what "serious health condition" she contends

was the one that prompted· her to take Shaun to the Philippines. She appears to suggest three such conditions: The injuries from the August 5 beating, Shaun's chronic behavioral problems, and Shaun's "combined psychological and physical condition." On this record, none qualifies as a "serious health condition" under the FMLA and the relevant administrative rules.

■ First, the injuries from the beating did not constitute a "serious health condition." The parties disagree as to whether those injuries "incapacitated" Shaun for more than three consecutive days, as required by 29 C.F.R. § 825.114(a)(2)(i). However, Shaun's March 1998 declaration states: "I just did not and could not do anything for four or five days after August 5 [,1995]." Notwithstanding the stronger evidence to the contrary, his declaration creates a disputed issue of fact and precludes summary judgment on the issue of "incapacity."

However, Shaun's injuries from the beating still do not qualify as a "serious health condition," because he did not receive "[t]reatment two or more times" for those injuries. 29 C.F.R.

3. The relevant rule, 29 C.F.R. § 825.114, provides in part:

(a) For purposes of FMLA, "serious . health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:

....

(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of

health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

(ii) Any period of incapacity due to pregnancy, or for prenatal care.

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(Italicization omitted.)

§ 825.114(a)(2)(i)(A). Shaun was treated *only once* at the emergency room, on August 6.

■ Plaintiff argues that Shaun was treated for his injuries from the assault on two more occasions, on August 9 by Lawler and on August 17 by Solomon. Neither of those episodes reasonably can be characterized as "treatment" of Shaun's injuries from the assault. "Treatment" is loosely defined in the Department of Labor's rules implementing the FMLA; under the relevant rules, "[t]reatment ... includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition" but does not include "routine physical examinations." 29 C.F.R. § 825.114(b). Lawler, a counseling assistant, met with Shaun for a *pre-arranged* drug counseling session. He happened to ask Shaun about his black eye, but Shaun told him that he was fine and minimized the incident. There is no indication in the record that he and Shaun mentioned the incident again during the drug counseling session. Lawler's question does not amount to "examination" or "evaluation" of Shaun's injuries from the assault but, rather, was plainly a passing expression of curiosity and concern.

■ Solomon never met Shaun; he merely spoke to Shaun's mother on the phone, once, and wrote a letter on her behalf. There is no indication that Solomon had any specific information about Shaun's physical injuries. To the extent that Solomon remembers his conversation with Plaintiff or his motivation for writing the letter, it appears that he was concerned about treatment for Shaun's behavioral problems, not for his physical injuries.

There is no factual dispute about what Lawler and Solomon did. The question is whether, under the FMLA, their actions constituted "treatment" of Shaun's physical injuries from the assault. We conclude that they did not: Neither Lawler nor Solomon "examined" or "evaluated" Shaun's injuries or treated those injuries in any other manner. Accordingly, Shaun's injuries from the assault were not a "serious health condition" entitling Plaintiff to FMLA leave.

■ Next, we conclude that Shaun's psychological condition did not constitute a "serious health condition." Plaintiff asserts that Shaun's psychological problems amounted to a "chronic serious health condition" within the meaning of 29 C.F.R. § 825.114(a)(2)(iii). That argument fails, because "chronic serious health conditions" must be accompanied by periods of incapacity. *Id.* Plaintiff asserts, without citation to the record, that Shaun's psychological condition caused episodic incapacity. However, there is *no evidence whatsoever* in the record that Shaun suffered any period of incapacity—inability to perform regular daily activities—as a result of his behavioral problems.

■ Finally, Plaintiff argues that "the combination of Shaun's physical and psychological condition rises to the level of a serious health condition." The point of that argument is to link the alleged period of incapacity from the assault with the continued course of treatment for Shaun's behavioral problems, thereby creating a "combined condition" that satisfies the requirements of the FMLA and the relevant administrative rules.

As authority for her "combined condition" argument, Plaintiff cites *Price v. City of Fort Wayne,* 117 F.3d 1022 (7th Cir. 1997). In *Price,* the plaintiff simultaneously suffered from "an assemblage of [conditions] including elevated blood pressure, hyperthyroidism, back pain, severe headaches, sinusitis, infected cyst, sore throat, swelling throat, coughing and feelings of stress and depression." *Id.* at 1023. There was no dispute that the plaintiff was incapacitated by that combination of conditions or that she underwent continuing treatment: She saw her doctor eight times over the relevant two-month

period and underwent a thyroid ultrasound, a needle biopsy, an excision of a mass, and a CT scan. *See id.* at 1024. Rather, the question was whether the plaintiff's conditions could be considered together for purposes of the FMLA, or whether each of the conditions had to be considered separately to determine whether one, by itself, was a "serious health condition." *Id.* The court concluded that the conditions could be considered together and that a group of seemingly unrelated conditions that combine to incapacitate a person and to require continuing treatment can, together, constitute a "serious health condition." *Id.* at 1025.

The difficulty with applying the reasoning of *Price* here is that there is no competent evidence in the record to suggest that Shaun suffered from combined conditions that incapacitated him. Shaun received sporadic counseling beginning in 1991 and was assaulted in 1995, but there is nothing to suggest that Shaun ever was treated for a combination of physical and psychological symptoms, or that he was incapacitated by a combined condition. There simply is no basis in this record to conclude that Shaun's various behavioral and emotional problems ever "combined" with the passing physical effects of the assault to create a "serious health condition."

### C.  *Leave to "Care For" a Child*

██ Further, even if Plaintiff *had* created a factual dispute on the question whether Shaun had a combined physical and mental condition, or some other "serious health condition," she still would not be entitled to FMLA leave. As noted, the FMLA provides for leave to "care for" a child who has a serious health condition. The Department of Labor's rules provide some explanation about what it means to "care for" a person with a serious health condition. Those rules state, at 29 C.F.R. § 825.116(a), that the FMLA "encompasses both physical and psychological care." The rule gives two examples of "caring for" a family member: (1) "[W]here . . .

the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor"; and (2) "providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care." *Id.*

Plaintiff's asserted purpose in moving Shaun to the Philippines was to keep him safe from further beatings. She was not moving Shaun so that he could receive superior—or any—medical or psychological treatment. Indeed, Plaintiff had no specific plans to seek medical attention for Shaun when she reached the Philippines, and he did not see a doctor of any kind for more than five months after he moved overseas. Further, it is undisputed that there were no psychological services available within a three-hour drive of the rural area of the Philippines to which Plaintiff took Shaun.

Plaintiff's act of taking Shaun to a foreign country and leaving him with relatives—although motivated by an understandable concern for Shaun's safety—did not amount to "caring for" Shaun for purposes of the FMLA. The relevant administrative rule, 29 C.F.R. § 825.116, suggests that "caring for" a child with a "serious health condition" involves some level of participation in ongoing treatment of that condition. If, as Plaintiff suggests, Shaun was suffering from a serious mental and physical condition, then Plaintiff could not "care for" him under the FMLA by removing him to a place where he would receive *no* treatment for either condition and leaving him there.

### D.  *Estoppel and Waiver*

██ Plaintiff also argues that Defendant is estopped from denying that Shaun had a "serious health condition." First, she argues that Defendant is estopped because it did not request a second medical certification regarding Shaun's condition after she provided it with Dr. Solomon's letter.

When an employee requests FMLA leave to care for a relative, the employer "may require" that the request be accompanied by a certification from a health care provider. 29 U.S.C. § 2613(a). That certification must state (1) the date on which the serious health condition began, (2) the probable duration of that condition, (3) the medical facts regarding the condition, (4) a statement that the employee is needed to care for the relative, and (5) an estimate of the amount of time during which the employee will need to care for the relative. *See* 29 U.S.C. § 2613(b). If the employer is dissatisfied with the certification, it may require, at its own expense, second and third certifications. *See* 29 U.S.C. § 2613(c), (d).

In *Sims v. Alameda–Contra Costa Transit District*, 2 F.Supp.2d 1253, 1263 (N.D.Cal.1998), the district court concluded that, if an employer chooses to require a first certification, but does not choose to require a second certification, it is not entitled to challenge the "findings" in the first certification—specifically, the finding of a "serious health condition"—if the case ends up in court. Rather, the employer is bound by those findings. *See id.*

The parties debate the merits of *Sims* at length, but it is readily distinguishable. *Sims* involved a medical certification requested by the employer and provided by the employee. Here we have no proper certification. Dr. Solomon's letter did not satisfy the requirements for medical certification specified by 29 U.S.C. § 2163(a, b). In fact, it did not even establish or claim that Shaun had a serious medical condi-

tion. *See Sims*, 2 F.Supp.2d at 1263 ("AC Transit waived its right to litigate whether Sims had a serious medical condition only if Sims' initial certification was sufficient to establish that he had such a condition."). Plaintiff points to no provision of the FMLA itself, or of the relevant administrative rules, that even arguably estops Defendant from disputing the contents of the letter in such circumstances.

Second, Plaintiff argues that Defendant is estopped from denying that Shaun had a "serious health condition" because it did not provide her with written notice of her FMLA rights and obligations. However, as soon as Plaintiff made an FMLA claim, in March 1996, Defendant requested FMLA certification and mailed her the appropriate form.[4]

■ Plaintiff contends that Defendant should have known that her initial vacation request actually was a request for FMLA leave and provided her with written notice at that time. However, even if that were true, nothing in the statute or rules suggests that Defendant is estopped from arguing about Shaun's health. Rather, the result merely would be that Defendant could not argue that Plaintiff had failed to provide 30 days' notice of her need for FMLA leave, as required by the statute. Because Defendant is not arguing about Plaintiff's failure to provide notice, and the district court did not mention the 30 days' notice requirement in its order, Plaintiff's argument is beside the point.

■ Plaintiff next argues waiver. In her third and fourth claims for relief,

---

**4.** As noted, Plaintiff never provided a certification to Defendant. Nevertheless, an incomplete copy of the form is in the record. Dr. Rath filled it out in part, on June 24, 1996, and apparently returned it to Plaintiff's counsel. Rath had not treated Shaun since 1991 and based many of his conclusions in the form on what Plaintiff told him. In the form, Rath states that Shaun had a "serious health condition" during three periods: Beginning August 20, 1991, beginning February 16, 1995, and beginning January 25, 1996. Rath also states that the "probable duration of con-

dition or need for medical treatment" was, in each case, six months. Accordingly, even Rath's partially completed medical certification form does not support Plaintiff's allegation that Shaun had a serious medical condition under the FMLA when she took him to the Philippines on August 17, 1995. The closest period during which Shaun suffered from such a condition, according to Rath, was the six-month period beginning February 16, 1995. That period ended on August 16, 1995, the day before Plaintiff and Shaun left for the Philippines.

Plaintiff alleged that Defendant failed to post notices of FMLA and CFRA rights in a conspicuous place. Plaintiff does not assign error to the district court's grant of summary judgment on those claims. However, on appeal she repeats her contention that notices were not posted and asserts that, as a result, Defendant "has waived its right to dispute" the question of Shaun's health.

The evidence in the summary judgment record does not support Plaintiff's factual contention. Her only evidence is her own declaration and the declaration of a co-worker, each of which states that the declarant *did not see* FMLA or CFRA notices. However, the record also contains an affidavit from the person who is responsible for posting FMLA and CFRA notices, stating that the required notices *were posted* on an office bulletin board, as well as statements from other employees who saw the notices. Plaintiff's evidence does not directly contradict the affidavit from the person who posted the notice and, thus, creates no issue of fact. Even if Plaintiff and her co-worker did not read the notices, the undisputed evidence in the record is that they were posted.

*E. Wrongful Termination Claim*

Finally, Plaintiff contends that she was wrongfully terminated in violation of California laws forbidding discrimination on the basis of sex. The basis for that contention is Plaintiff's assertion that Elaine Phelps discriminated against her because Plaintiff is a woman. As evidence of Phelps' sex-based discrimination, Plaintiff cites the following statement from a 1998 declaration by Plaintiff's co-worker Solane Louie: "Hermie Baron heard comments from Elaine Phelps, to the extent that 'The first thing I should do when I become lab manager is to fire Fe Marchisheck.'" In her declaration, Louie also reports that she heard Phelps say that Plaintiff was lazy, left work early, slept on the job, and came to work late.

Plaintiff acknowledges that she did not raise the issue of sex discrimina-

tion before the district court. However, she urges us to consider her claim anyway. We decline to do so. Plaintiff has not presented any compelling reason why the normal preservation requirements should not apply in this case. She was in possession of substantially similar statements by Louie as early as 1995, which defeats her assertion that this is newly discovered evidence.

CONCLUSION

Plaintiff's desire to move her son to a more wholesome environment is laudable, and her further desire to do so promptly and at a reasonable cost is understandable. Nevertheless her predicament is not one that Congress protected through the FMLA nor one that the California legislature protected through the CFRA. Those statutes are designed to permit employees to take leaves for certain medical purposes only, and Plaintiff's leave was not for such a purpose.

The district court's grant of summary judgment to Defendant is

AFFIRMED.