**Joseph R. SCAMIHORN, Jr.,**
**Plaintiff–Appellant,**

v.

**GENERAL TRUCK DRIVERS, Office, Food and Warehouse Union, Local 952; Albertson's, Inc., Defendants–Appellees.**

No. 00–55722.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 18, 2001— Pasadena, California.

Filed March 4, 2002.

Gregory M. Lee, Irvine, CA, for plaintiff-appellant Joseph R. Scamihorn, Jr.

Robert D. Vogel, David Maggiore–Anet, Littler Mendelson, Los Angeles, CA, for defendant-appellee Albertson's, Inc.

Before BROWNING, FERNANDEZ and FISHER, Circuit Judges.

## OPINION

FISHER, Circuit Judge.

This case concerns the construction and application of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Adopted by Congress in 1993 to address conflicts facing working men and women confronted with their or their family members' serious health problems, the FMLA under certain conditions guarantees employees an amount of unpaid leave each year to deal with such problems. It provides that employees returning from such leave must be returned to the same or an equivalent position. Joseph Scamihorn, Jr. ("Scamihorn") faced such a conflict after his sister was murdered by her ex-husband, causing Scamihorn's 73–year-old father, Joseph Sr., to fall into a deep depression. After discussions with his employer, Albertson's, Scamihorn left his job as a truck driver for several months to provide assistance and comfort to his ailing father. When he sought to return to work, Scamihorn found he had to start over as a probationary employee with no seniority. Scamihorn contends his circumstances fell under the protection of the FMLA, so Albertson's was required to treat his absence as an unpaid leave and to reinstate him in his previous job and seniority level based on his original start date.

The district court, although recognizing Scamihorn's altruistic motives and actions on behalf of his father, granted summary judgment for Albertson's, holding that Scamihorn did not qualify for FMLA protection because he had not "cared for" his father within the meaning of the Act. Albertson's also argued that Scamihorn failed to show that his father suffered from a "serious health condition," another FMLA requirement; but the district court did not reach that issue. Upon our review of the record and of the intent and the relevant criteria of the FMLA, we conclude that summary judgment was in error. The Scamihorn family's health problem is of the type the FMLA plainly was intended to address. Although it is a close call whether Scamihorn ultimately can prove he indeed fits within the requisite FMLA criteria, we believe at this stage of the proceedings—viewing the evidence most favorably to him as we must—he has provided sufficient evidence to create triable issues of fact warranting a trial on the merits.

## I.  History

Scamihorn began his employment with Albertson's, a retail food and drug operation, as a truck driver at the Brea, California distribution center in June 1990. In July 1994, Scamihorn's sister, Misty, was murdered by her ex-husband. Scamihorn's 73–year-old father, Joseph Scamihorn, Sr., who had undergone heart surgery the preceding year and also suffered from diverticulitis, a weakening of the colon, began suffering from depression following Misty's death. After visiting his father in Reno, Nevada almost every weekend after Misty's death, Scamihorn decided that he and his family would move temporarily to Reno to assist his father as he coped with the depression. There is some evidence to indicate that Joseph Sr.'s doctor suggested the move.

In early October 1994, Scamihorn met with Albertson's Human Resources Manager, David Moore, to request a one-month, unpaid leave of absence effective October 5, 1994 to November 5, 1994. Scamihorn completed and signed a formal "leave of absence request" form, on which he indicated the purpose of the leave was to deal with the illness of his father and to settle the estate of his deceased sister. Moore did not advise Scamihorn of the FMLA. Albertson's granted the leave of absence, but told Scamihorn that he could not work for another employer while on leave or he would be immediately terminated.

While residing in Reno, Scamihorn spent time with his father, drove him to psychological counseling sessions and performed household chores. In late October 1994, Scamihorn contacted Moore to tell him that he needed to stay in Reno beyond the initial 30 days to continue to assist his father and that he needed a means to support his family until he could return. Moore reiterated that if Scamihorn worked for another employer while on leave, he would be terminated. During the conversation, Moore and Scamihorn agreed Scamihorn would voluntarily resign from employment with Albertson's. Scamihorn claims Moore told him that he would be rehired if he returned to work within six months of his leave date in October 1994.

Scamihorn remained in Reno until approximately March 1995. By that time, Joseph Sr.'s condition had improved significantly and Scamihorn returned to California. He sought reinstatement, complete with seniority, to his former position with Albertson's. Moore informed Scamihorn that because of Albertson's collective bargaining agreement with Teamster Union Local 952 ("Union"), Albertson's could not rehire him at that time. Later, however, Albertson's rehired Scamihorn as a probationary truck driver in May 1995. According to the terms of the collective bargaining agreement, Albertson's could not restore Scamihorn's seniority without the Union's permission, which the Union refused to give.

Scamihorn filed suit against Albertson's and the Union in federal court alleging violation of the FMLA. Scamihorn claimed Albertson's and the Union failed to advise him of his rights under the FMLA. He argued that because his circumstances fell under FMLA protection, Albertson's should have granted him leave and he should have been reinstated in his former position and seniority level upon his return from Reno.[1]

The district court dismissed all claims against the Union and some of the claims against Albertson's.[2] Albertson's then moved for summary judgment on the remaining claim, arguing Scamihorn's father did not have a "serious health condition" and Scamihorn did not "care for" his father within the meaning of the FMLA. The court found that Scamihorn did not "care for" his father under the terms of the FMLA and granted the motion. Scamihorn now appeals.

We review the district court's grant of summary judgment de novo. *Weiner v.*

---

1. Scamihorn resided in Reno for more than 12 weeks but returned to California prior to the expiration of six months. If Albertson's had granted Scamihorn leave under the FMLA, he would have been required to return to work after the expiration of 12 weeks. Because he was not given that opportunity, Scamihorn could not conform to the 12–week limit of the FMLA.

2. The court granted the Union's motion to dismiss on the ground that the Union is not an "employer" as defined by the FMLA, but gave Scamihorn leave to amend because it recognized "Plaintiff may be able to state a claim against the Union on another theory." Scamihorn did not do so, nor has he appealed the dismissal.

*San Diego County,* 210 F.3d 1025, 1028 (9th Cir.2000). The court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist and whether the district court applied the relevant substantive law. *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

## II. The FMLA

■ Congress enacted the FMLA to allow workers flexibility in scheduling time off to deal with family and medical problems and alleviate some of the tension created by the competing demands of work and family in modern society. The legislative history articulates the rationale for the FMLA:

> Private sector practices and government policies have failed to adequately respond to recent economic and social changes that have intensified the tensions between work and family. This failure continues to impose a heavy burden on families, employees, employers and the broader society. [The FMLA] provides a sensible response to the growing conflict between work and family by establishing a right to unpaid family and medical leave for all workers covered under the act.

S.Rep. No. 103–3, at 4 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 6.

The FMLA does not replace traditional employer-established sick and personal leave policies; rather it provides leave for uncommon and often stressful events such as caring for a family member with a serious health condition. *See, e.g., Price v. City of Fort Wayne,* 117 F.3d 1022, 1023(7th Cir.1997) (summarizing goals of the FMLA); *cf. Caldwell v. Holland of Texas, Inc.,* 208 F.3d 671, 676 (8th Cir. 2000) (FMLA prevents individuals "from having to choose between their livelihood and treatment for their own or their family members' serious health conditions"). The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period . . . (c)[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1). At the conclusion of the qualified leave period, the employee is entitled to reinstatement to the position the employee previously held or to an equivalent one with the same terms and benefits that existed prior to the exercise of leave. *Id.* § 2614(a). It is undisputed that Scamihorn was an "eligible employee." *See id.* § 2611(2). Therefore, for his leave to qualify under the terms of the FMLA, Scamihorn must demonstrate that his father had a "serious health condition" and that he needed to "care for" his father.

■ Although the language of the FMLA provides little guidance on the meaning of the phrases "care for" and "serious health condition," the Department of Labor has issued both interim and final regulations addressing the meaning of these phrases pursuant to an express delegation of authority to the Secretary of Labor to promulgate regulations "necessary to carry out" the FMLA. *See id.* § 2654. We are bound to follow the regulations. *See Auer v. Robbins,* 519 U.S. 452, 457, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (where Congress has not directly addressed an issue in drafting the statute, the Secretary's approach must be sustained as long as it is "based on a permissible construction of the statute") (*quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The Department of Labor issued the interim regulations in 1993; the final regulations became effective in 1995, after Scamihorn's leave. *See* 60 Fed.Reg. 2180 (1995),

*amended by* 60 Fed.Reg. 6658, 6658 (1995) (deferring effective date of the final regulations until April 6, 1995). Regulations cannot be applied retroactively unless Congress has so authorized the administrative agency and the language of the regulations requires this result. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). "Because the FMLA's grant of authority to the Secretary of Labor to promulgate regulations, 29 U.S.C. § 2654, does not affirmatively grant her the authority to make those regulations retroactive, and because the final regulations themselves do not provide any indication that they are to be applied retroactively," *Bauer v. Varity Dayton–Walther Corp.*, 118 F.3d 1109, 1111 n. 1 (6th Cir.1997), they do not govern this case. The interim regulations apply here. We shall look to the final regulations, however, as an aid in interpreting the interim regulations. *See Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir.1999); *Victorelli v. Shadyside Hosp.*, 128 F.3d 184, 186 (3d Cir.1997).[3] In any event, we likely would reach the same result under either version.

## III. Joseph Scamihorn, Sr.'s Situation

Joseph Sr. was employed by American Veterans ("AMVETS") as a full-time service officer and advocate for military veterans, representing veterans in the Reno area in disputes with the Veterans Administration. His primary office was located in the Ioannis A. Lougaris Veterans Medical Center in Reno, but he also maintained offices in two other locations and sometimes worked from home. Joseph Sr. became depressed after his daughter's death in July 1994. He stated in his declaration

in opposition to summary judgment that Misty's death, "combined with the physical and mental after-effects from the [1993] heart [bypass] surgery and the diverticulitis, put me into a state of deep despair and depression."[4] Beginning in July 1994 and continuing into 1995, he obtained counseling from psychologist Marilyn Brannon and psychiatrists Ronald Fox and Betty Small, all of whom worked at the Veterans Medical Center where Joseph Sr. had his own office. Dr. Small prescribed medication for Joseph Sr.'s depression. Dr. Fox stated that he "suffered a significant depressive illness which resulted in his being treated at the Ioannis A. Lougaris Veterans Medical Center, Reno, Nevada for a depressive disorder." Dr. Brannon testified that Joseph Sr. functioned at a level of 65 on a scale of one to 100, where a rating of 100 means a person is fully functioning and a score of 55 or under means hospitalization likely is necessary.

Between July 3, 1994 (the date of Misty's death) and January 1996, Joseph Sr.'s work records do not show any missed days of work due to illness. Joseph Sr., in his declaration, claimed the records do not accurately reflect days he was at home and in fact not working due to his illness. He missed one week of work after Misty's funeral in July 1994 because he was grieving and unable to work, but this was recorded as annual leave rather than sick leave time. Additionally, Joseph Sr. declared that he missed seven days of work in August 1994 and that on five of those days he was "so depressed that I could not work the rest of the week." Joseph Sr. did not dispute that he worked during much of the time he suffered from depression. He admitted: "Work was part of my

---

**3.** Unless otherwise noted, the regulations discussed herein are the 1993 interim regulations.

**4.** Joseph Sr. gave deposition testimony early in the litigation. Later, in opposition to Al-

bertson's motion for summary judgment, he submitted a declaration which Albertson's argues conflicted with his prior deposition. We address Albertson's specific objections in Part IV.

salvation." But he also said there were "[t]imes when in the office I would break-down." Dr. Brannon noted he "tends to cope by pushing himself with work." According to Joseph Sr., his ability to perform his job duties despite his depression was in part because his wife also worked for AMVETS and had access to his office in the Veterans Medical Center, so she could assist him with paperwork and whatever tasks he could not perform from home. Additionally, during Joseph Sr.'s treatment, Dr. Brannon suggested to him that he give more of his workload to his assistant. It is unclear from the record whether he acted on that suggestion.

It is in this context that Scamihorn decided to move temporarily to Reno to assist his father. As Dr. Fox described the situation:

> At the recommendation of Mr. Scamihorn's treating psychologist to involve family members in the recovery process, Mr. Scamihorn's son, Joseph Scamihorn, Jr., was contacted and subsequently chose to move to Reno, Nevada temporarily in an effort to help his father work through this loss as well as work through the loss for himself.

While living in Reno, Scamihorn spent several hours each day talking with his father about Misty's death. The son performed various chores around the house. He shoveled snow between November 1994 and January 1995, chopped the firewood used to heat the house on four or five occasions between October 1994 and December 1994, cleared the backyard and cleaned the garage. Scamihorn also drove his father to counseling sessions with his mental health care providers on four or five occasions when his father was "too emotionally distraught to drive." Dr.

Brannon testified that she could not remember if Joseph Sr. was driving around this time, but noted he "had some problems with driving." In all events, it is undisputed that Joseph Sr. often drove himself to work on the days he worked out of his office at the Veterans Medical Center, which was located approximately 52 miles from his home.

## IV. "Serious Health Condition"

As we shall discuss in Part V, we conclude the district erred in granting summary judgment on the issue of whether Scamihorn needed to care for his father. The FMLA provides leave for an employee to care for a parent only if the parent has a serious health condition. In determining whether Scamihorn needed to care for his seriously ill father, we must first address whether Joseph Sr. actually suffered from a "serious health condition," the issue the district court did not reach.

The FMLA's definition of serious health condition includes a "mental condition" that involves . . . (B) continuing treatment by a health care provider. 29 U.S.C. § 2611(11). The FMLA's legislative history noted that "[t]he definition of 'serious health condition' . . . is broad and intended to cover various types of physical and mental conditions." S.Rep. No. 103–3, at 28 (1993), reprinted in 1993 U.S.C.C.A.N. at 30. Albertson's does not dispute that Joseph Sr. suffered from a legitimate mental illness.[5]

■ The interim regulations specifically define what qualifies as a serious health condition:

> For purposes of FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves . . . (2)[a]ny period of

---

**5.** The regulations provide that "the employer may require an employee to submit certification from a health care provider to substantiate that the leave is due to the serious health condition of the employee or the employee's immediate family member." 29 C.F.R. § 825.100(d). Albertson's did not request such certification.

incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider.

29 C.F.R. § 825.114(a) (1993).[6] Additionally, the regulations discuss the conditions necessary to meet the definition of "[c]ontinuing treatment by a health care provider." The condition relevant to this case states:

> The employee or family member in question is treated two or more times for the injury or illness by a health care provider. Normally this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider.

Id. § 825.114(b)(1) (1993). Therefore, to meet the requirements established by the FMLA and the accompanying regulations, Scamihorn must prove that his father's depression resulted in an incapacity—absence from work or other daily activities—of more than three consecutive days and that he was receiving continuing treatment by a healthcare provider.

## A. Continuing Treatment

■ Specifically, the continuing treatment must have consisted of treatment two or more times by a health care provider. Joseph Sr. became depressed after his daughter's death in July 1994 and, initially, in his deposition, he downplayed the severity of his emotional problems. He insisted he talked to Dr. Brannon informally on various occasions and that "[i]t wasn't an official visit." As for his visits to Dr. Fox, he claimed they were few and were "off the record." Joseph Sr. said he viewed these sessions more as discussions with friends than as official counseling sessions.

■ Later, however, in his declaration, Joseph Sr. admitted to suffering from "deep despair and depression."[7] He

---

**6.** The major distinction between the interim and final regulations is that the latter explicitly require the period of incapacity to span more than three *consecutive* days. See 29 C.F.R. § 825.114(a)(2)(i) (1995). Some courts have read the interim regulations to require the three days of incapacity to be consecutive. See, e.g., Haefling, 169 F.3d at 499; cf. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 162 n. 8 (1st Cir.1998) (assuming without deciding that interim regulations require three consecutive days). We will assume, given the quantitative approach of the final regulations, that the days must be consecutive.

**7.** Albertson's argues that portions of Joseph Sr.'s and Scamihorn's declarations should be excluded because they are self-serving and lack foundation, objections it raised in the district court. With respect to Joseph Sr., Albertson's argues that his declaration contradicts his earlier deposition, where, as he admits, he did not fully remember all of the information pertinent to this case. He was unrepresented by counsel at his deposition. As a general rule, an affidavit submitted in

response to a motion for summary judgment which contradicts earlier sworn testimony without explanation of the difference does not automatically create a genuine issue of material fact. Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991). However, the district court first "must make a factual determination that the contradiction was actually a 'sham.'" Id. at 267. The district court did not rule on Albertson's objections to statements in Joseph Sr.'s declaration. "While this court has held that a party may not 'create his own issue of fact by an affidavit contradicting his prior deposition testimony,' Foster v. Arcata Assoc., Inc., 772 F.2d 1453, 1462 (9th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986), the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." Messick v. Horizon Indus. Inc., 62 F.3d 1227, 1231 (9th Cir.1995). We conclude that, in light of the corroborating statements of Dr. Fox and Dr.

sought counseling and treatment from a psychologist and two psychiatrists. Dr. Brannon testified that her talks with Joseph Sr. began informally and over time evolved into formal counseling sessions to deal with his grief. When Joseph Sr. indicated he wanted to spend more time talking with Dr. Brannon after their initial informal discussions, she "made that very clear that that would have to be in a psychotherapeutic realm and that we would have to set up a treatment plan and it would be a part of his record." She treated him for approximately seven months. Joseph Sr. was treated more than two times by Dr. Brannon alone and these formal counseling sessions qualify as "continuing treatment by a health care provider."

## B. Incapacity

■ The harder question is whether Scamihorn established a genuine issue of fact as to whether his father's condition resulted in incapacity for three or more consecutive days. On the subjects of incapacity and work attendance, the record contains conflicting evidence. Scamihorn says he needed to perform chores such as cutting wood to heat the house, shoveling snow and driving his father to counseling sessions on more than three occasions because his father was incapable of doing these things for himself. There is no mention of specific days on which Scamihorn performed these chores or whether he performed them on consecutive days. When asked if she limited her recommendation that Joseph Sr.'s family members be closely involved in his recovery process to Joseph Sr.'s son, Dr. Brannon testified that she had because "it was a little different with his son than the girls because Joe needed some extra help with the house and

the trailer and different kinds of things going on for him at the time."

Albertson's points out that when Joseph Sr. worked out of his office at the Veterans Medical Center, he often drove himself the 52 miles each way. Furthermore, in his deposition, Joseph Sr. testified he did not miss any days of work between September 1, 1994 and March 1, 1995. However, in his declaration, he clarified that in actuality he "missed additional days of work due to my daughter's murder that may not be reflected on my attendance record because I am allowed to work at home and my wife works out of the same office as me. On those days she was able to handle the paperwork and cover for me." He did not specify how many days he missed due to his depression and the record contains no additional evidence on this subject. Dr. Brannon, however, noted Joseph Sr.'s troubles with handling a heavy workload and testified that his wife "worked in the AMVETS with him, which was part of the only reason he could remain doing any kind of work. There was a lot—there was a period of time where he was not in the office and she—he would work at home and she would come in and do the paperwork and do the filing and kind of cover the work load." Albertson's argues that, because AMVETS's records do not reflect any absences for Joseph Sr., the court should disregard Joseph Sr.'s sworn statements to the contrary and conclude he did not miss any days of work. Given the nature of Joseph Sr.'s job and his ability to work at home, there are questions whether these records accurately reflect his work attendance. A valid assessment of Joseph Sr.'s incapacity requires further development of the record.

With all inferences taken in Scamihorn's favor, there exists a genuine question of

Brannon, Joseph Sr.'s declaration sought to clarify statements made in his deposition, is

not a sham and therefore should not be excluded.

whether he met all statutory requirements to show that his father suffered from a "serious health condition."

## V. "To Care For"

■ Although the FMLA does not define the phrase "to care for," the interim regulations discuss what it means that an employee is "needed to care for" a family member:

The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a seriously ill child or parent receiving inpatient care.

29 C.F.R. § 825.116(a) (1993). The final regulations clarify that the concept of "care" includes providing psychological comfort to those "receiving inpatient *or home care.*" *See* 29 C.F.R. § 825.116(a) (1995) (emphasis added). The legislative history of the FMLA underscores the significance of this type of care:

The phrase "to care for" ... is intended to be read broadly to include both physical and psychological care. Parents provide far greater psychological comfort and reassurance to a seriously ill child than others not so closely tied to the child. In some cases there is no one other than the child's parents to care for the child. The same is often true for

adults caring for a seriously ill parent or spouse.

S.Rep. No. 103–3, at 24 (1993) *reprinted in* 1993 U.S.C.C.A.N. at 26.[8] The regulations specifically contemplate situations that encompass both physical and psychological care for a family member. The interim regulations list examples of situations in which an employee may "care for" a family member, but the list by its terms is not all-inclusive. In addition to introducing the "situations" by the phrase "for example," the listing ends with "etc.," signifying that other types of activities are contemplated.

While residing in Reno, Scamihorn daily talked with his father about Misty's death and he performed various chores around the house, including shoveling snow, chopping the firewood used to heat the house, clearing the backyard and cleaning the garage. Additionally, Scamihorn drove his father to counseling sessions on four or five occasions. Although Joseph Sr. stated in his deposition that during his depression he still was able to shower, dress, eat, drive, take care of medical and safety needs and engage in various daily activities without assistance from others, he later declared, "I felt I needed him [Scamihorn] by me full time."

Albertson's argues that under the regulations, " 'caring for' a [family member] with a 'serious health condition' involves some level of participation in ongoing treatment of that condition." *Marchisheck v. San Mateo County,* 199 F.3d 1068, 1076 (9th Cir.1999). In *Marchisheck,* we held that an employee who took a leave to help her son with alleged psychological problems could not have participated in the son's treatment because she moved him to a place where no treatment was available.

8. As indicated earlier, Joseph Sr. was married during this time. Aside from the evidence regarding Joseph Sr.'s wife's assistance with his work duties, the record is silent as to his wife's participation in his treatment and care. Regardless, Dr. Brannon testified that she felt Joseph Sr. specifically needed his son around to aid his recovery.

*Id.* That is not the case here. Unlike the situation in *Marchisheck,* Scamihorn did not withdraw his father from treatment; Scamihorn moved to Reno precisely to be a part of that treatment. Scamihorn does not claim to have personally attended any of Joseph Sr.'s counseling sessions with Dr. Brannon or Dr. Fox, but he participated in the treatment through both his daily conversations with his father about Misty and the grief associated with her death and his constant presence in his father's life. Both Dr. Brannon and Dr. Fox emphasized this fact.

The regulations clearly contemplate not only the physical but, just as important, also the psychological care that seriously ill parents often require from their caregiving children. There is evidence in the record that Joseph Sr. at times was unable to complete daily tasks and it was necessary for his son to assist *and* comfort him. Dr. Brannon attested that: "[H]is son's presence helped. As I recall it[he] helped bring wood in. I mean, there were chores around the house as well as there were other emotional things, that just having his son there seemed to help." Joseph Sr. acknowledged that "[his son's] being there was invaluable to my emotional recovery."

The district court concluded Joseph Sr. was able to care for his own basic needs and although Scamihorn's actions were admirable, Joseph Sr. did not need his son to care for him. Viewing the evidence in the light most favorable to Scamihorn, we believe Scamihorn raises a genuine issue regarding whether his activities were necessary because his father was at times unable to care for some of his own basic needs.

## VI. Conclusion

In considering the FMLA, Congress recognized:

> The percentage of adults in the care of their working children or parents due to physical and mental disabilities is growing. Because removing people from a home environment has been shown to be costly and often detrimental to the health and well-being of persons with mental and physical disabilities there is a trend away from institutionalization. While preferable, independent living situations can result in increased care responsibilities for family members, who by necessity are also wage earners. Home care, while laudable, can also add to the tension between work demands and family needs.

S.Rep. No. 103-3, at 6 (1993), *reprinted in* 1993 U.S.C.C.A.N. at 8-9. Scamihorn experienced first-hand the tension between his job and his father's psychological well-being. The purpose of the FMLA is to relieve some of this tension by giving employees time off without pay to care for relatives who suffer from serious health conditions.

Admittedly, there are gaps and uncertainties in the record here that suggest Scamihorn may be unable ultimately to prove that he meets the criteria established by the Department of Labor regulations. For instance, it appears that because Joseph Sr. worked in the Veterans Medical Center, he was able to obtain treatment without officially taking time off from work and completing insurance and other medical forms to document and authorize the treatment. He also was able to work from home and thereby avoid taking sick leave when he felt too depressed to go to his office. The mere lack of formalities alone, however, would not justify the exclusion of FMLA coverage here. Viewing the evidence in the light most favorable to Scamihorn, as we must, we conclude that he set forth sufficient evidence to create genuine issues of disputed material fact to be resolved in a trial.

For the reasons stated, we reverse the district court's grant of summary judgment to Albertson's and remand for further proceedings.

REVERSED and REMANDED.

Opinion by Judge FISHER; Dissent by Judge FERNANDEZ.

FERNANDEZ, Circuit Judge, Dissenting.

I dissent from the decision that Scamihorn may be entitled to relief against his employer, Albertson's, Inc., on the theory that it deprived him of benefits under the Family Medical Leave Act. *See* 29 U.S.C. § 2612. This should be an easy case, which is clearly outside of the coverage of that Act. Really, it is.

Scamihorn makes the amazing claim that he had to leave his job and impose the burden of keeping it open for him upon his employer because he had to "care for" a parent who had "a serious health condition." 29 U.S.C. § 2612(a)(1)(C). I say amazing because the parent in question, a married man living with his wife, was able to and did care for himself. He took care of his own medical, hygienic, nutritional, and safety needs. He was not receiving in-patient or home care. He was able to drive about. *See, e.g.,* 29 C.F.R. § 825.116(a); *see also* 29 C.F.R. §§ 825.113, 825.114. In fact, he continued to work full time at his job, which required him to drive some 50 miles each way to and from the place of his employment. This is the married man who is allegedly so needy that Albertson's was required to give Scamihorn twelve weeks off so that his father could be taken care of.

That is not to say that Scamihorn's father was not burdened by a great sorrow brought about by the death of a daughter; of course he was. Who would not be so burdened? Nor is it to say that Scamihorn's father did not derive some comfort, and did not enjoy some assistance,[1] from his son; of course he did. Who would not? But it is to say that I find it highly doubtful that Congress passed the FMLA for the purpose of forcing employers to accommodate workers who desire to care for a relative who is perfectly capable of caring for himself and is doing so. If Congress had intended that the statute be that broad, it surely could and would have said so. But Congress had to balance concerns on both sides and only decided to burden employers when the situation was truly serious and the afflicted person truly needed care. To say that Scamihorn's father was unable to care for himself would not only insult an obviously active man,[2] but also would twist the FMLA almost beyond recognition.

Thus, I respectfully dissent.

---

1. Performance of some household chores, and occasional driving.

2. Also, it could easily be an insult to his helpful wife, with whom he was living.