[No. B127999. Second Dist., Div. Five. Apr. 10, 2000.]

MARJORIE PANG, Plaintiff and Appellant, v.
BEVERLY HOSPITAL, INC., Defendant and Respondent.

**COUNSEL**

Gronemeier & Associates and Dale L. Gronemeier for Plaintiff and Appellant.

Rushfeldt, Shelley & Drake, Linda C. Miller Savitt, Christine T. Hoeffner, and Dawn Cushman for Defendant and Respondent.

## OPINION

**GODOY PEREZ, J.**—Plaintiff Marjorie Pang appeals from the judgment of dismissal entered after the court granted its own motion for judgment on the pleadings on her claim for violation of her right to take a family care leave. (Gov. Code, § 12945.2.) For the reasons set forth below, we affirm the judgment.

### PROCEDURAL HISTORY

Plaintiff and appellant Marjorie Pang sued her employer, defendant and respondent Beverly Hospital, Inc. (the Hospital), after the Hospital fired Pang from her job as a physical therapist. Pang's operative first amended complaint alleged three causes of action: (1) she was fired in violation of the Moore-Brown-Roberti Family Rights Act (Gov. Code, §§ 12945.1, 12945.2, hereafter CalFRA) for taking time off work to care for her mother; (2) she

was fired because of her own medical condition or medical disability, in violation of the Fair Employment and Housing Act (Gov. Code, § 12940, subd. (a)); and (3) she was fired in violation of public policy.

In July 1998 Pang brought a motion for summary adjudication of her CalFRA cause of action. The moving and opposing papers were supported by documentary evidence, witness declarations, and deposition testimony.

At the start of the August 21, 1998, hearing on Pang's summary adjudication motion, the court issued a written tentative decision denying the motion because Pang failed to properly refer to or argue the facts set forth in her separate statement of undisputed facts. (Code Civ. Proc., § 437c, subd. (b).) The court, on its own motion, deemed the matter a motion for judgment on the pleadings. (Code Civ. Proc., § 438, subd. (b)(2).)

The tentative decision granted the court's motion for judgment on the pleadings (MJOP) because the purpose of Pang's leave—to help her elderly mother move from one home to another—did not qualify as leave to care for a parent under CalFRA. After hearing argument from the parties, the court granted the MJOP on that ground and adopted the tentative decision as its final decision. Pang dismissed her two remaining causes of action without prejudice on September 17, 1998, and the court entered judgment for the Hospital on September 24, 1998.[1]

### STANDARD OF REVIEW

An MJOP is equivalent to a demurrer and is governed by the same standard of review. All material facts that were properly pleaded are deemed true, but not contentions, deductions, or conclusions of fact or law. If leave to amend was not granted, we determine whether the complaint states a cause of action and whether the defect can reasonably be cured by amendment. If the pleading defect can be cured, the trial court committed reversible error. If not, we affirm. The plaintiff bears the burden of proof on this issue. Finally, the judgment will be affirmed if it is proper on any grounds raised in the motion even if the court did not rely on those grounds. (*Baughman v. State of California* (1995) 38 Cal.App.4th 182, 187 [45 Cal.Rptr.2d 82].)

In addition to the facts pleaded, we may consider matters that may be judicially noticed, including a party's admissions or concessions which can

---

[1] In order to ensure that there was truly one final judgment for purposes of appealability, we asked for and received supplemental briefs from the parties, stating that there was no agreement to permit revival of the two dismissed claims after this appeal was decided. (See *Four Point Entertainment, Inc. v. New World Entertainment, Ltd.* (1997) 60 Cal.App.4th 79, 82-83 [70 Cal.Rptr.2d 82].) Pang's counsel assured us during oral argument that Pang would not further pursue the dismissed claims.

not reasonably be controverted. (*Evans v. California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540, 548-549 [33 Cal.Rptr.2d 646].) At the request of both parties, we will do so here as to certain evidence placed before the trial court by the summary adjudication motion. Specifically, we will judicially notice the declarations of Pang and her sister, excerpts of Pang's deposition testimony, and her separate statement of undisputed fact, to the extent they bear on her need for family leave.[2] As our discussion below makes clear, these items constitute judicial admissions and concessions that are fatal to Pang's CalFRA claim.

### FACTS

Pang's complaint alleged that her mother, who lives in New York, suffered from numerous ailments, including narcolepsy,[3] cataplexy,[4] high blood pressure, arthritis, circulatory problems, and a heart condition. The mother suffered a stroke some years before, leaving her with balance problems. She also had neck pain and immobility of one arm due to a reverse curvature of her neckbones. The mother was periodically incapacitated by these conditions for more than three days at a time and was under the continuing supervision of a health care provider as a result. In late May 1996 Pang notified the Hospital she would soon have to go to the State of New York to help her mother move from one home to another. On June 4, 1996, Pang told the Hospital she needed to leave for New York that day. The Hospital fired Pang, claiming she abandoned her job.

Pang stated in her declaration that "the encroachments of age and medical problems" made it "increasingly difficult" for her mother to continue living in her two-story home. Pang's mother rented an apartment in May 1996, put her home up for sale and hired a moving company to take her belongings from her house to the new apartment. Pang handled many of her mother's business affairs and her mother asked that Pang help with packing and moving the mother's personal belongings because she was not able to do so herself. Pang spoke with her mother on June 3, 1996, and learned that the movers had just told her they were available only on June 7, 1996. "[W]hen I went to assist her in June 1996, I did assist her with matters such as moving

---

[2]The dispositive issue both below and on appeal is whether under the circumstances present here, Pang was caring for her mother under CalFRA when she helped her mother move to a new home. Since Pang's first amended complaint alleged that she was entitled to leave both to help her mother move *and* to care for her, were we to accept that allegation as true, we would have to reverse on that ground. Because the evidence before the trial court framed the issue more precisely than did her complaint, Pang asks that we consider the issue as thus "clearly presented."

[3]Sudden attacks of sleep.

[4]Sudden loss of muscle power.

and packing belongings which she was physically unable to do herself due to her medical conditions."

Jean Arnold, Pang's sister, confirmed their mother's various medical conditions. Arnold stated in her declaration that she lived in Florida. Her mother lived in a nearby trailer six months out of the year. During these periods, Arnold cared for and assisted her mother with her daily living activities. When her mother became incapacitated by one or more of her ailments, she was unable to leave the house without assistance. Her mother was unsteady on her feet and in February 1996 fell and injured herself, leaving her unable to care for herself for one week. When Arnold cared for her mother, she had her "under twenty-four hour watch. I would check on her in person and over the phone regularly several times a day; if she did not answer the phone because she was unable to get up to answer it, I would go see her immediately." Due to personal obligations, Arnold was unable to help her mother move in June 1996 and believed her mother was unable to move to her new apartment without help.

Pang's deposition testimony cast the circumstances surrounding her mother's move in a different light, however. Pang testified that her mother, then 81, was moving because "she was in failing health and decided to sell her home." She was having difficulty because of weakness and balance problems, used a walker, and was having trouble getting up and down the stairs of her two-story home. She also had a lot of yard work, which was difficult for her to do. "[S]he just found the house was getting to be too much for her to handle."

Pang admitted stating in a letter to the Hospital that she was the trustee of the trust that owned her mother's home and that she was the seller and had to sign the paperwork. She wrote this to show it was her responsibility to help her mother and denied going to New York in order to sign any documents.

Pang testified that her mother split her time between living in Florida and in New York. She drove a car, lived by herself, could bathe, use the bathroom, get out of bed, cook and get dressed by herself. Her mother never hired a nurse to care for her and had never lived in a rest home or other type of health care facility.

Pang testified that her mother hired movers and had a friend, Debbie, who was helping her pack and make phone calls. The movers notified Pang's mother on June 3 that they were available on June 7 but would not be available again until July 5. The mother told the movers that June 7 was

acceptable. There was no reason why Pang's mother could not have waited another month. Instead, it was the mother's decision to move on June 7 and it was "[j]ust her choice." There was an offer made on the house as of June 14, 1996.

When Pang was in New York during June 1996, she and Debbie helped Pang's mother gather the mother's belongings for the move. Debbie did not do much because Pang knew where her mother would want her furniture placed and Pang made those decisions. Asked to specify what she did while there, Pang testified, "Oh, basically just helping my mother, we had a lot of cleaning out to do." This included gathering and packing her belongings. In the evening, after finishing discarding unwanted items and packing the rest, Pang went to bed. Pang's mother was able to think coherently and assisted in selecting what to keep and what to discard. Pang's sister arrived the next day to help. The sister, who lived in Canada part of the time, was unable to come the day before because she and her husband had unspecified "duties" to perform.

Pang's separate statement included three undisputed facts concerning the reason for Pang's trip to New York which we deem relevant. The first stated, "In June 1996, Mrs. Pang was needed to help her mother move because her mother could not move on her own due to her medical conditions and because her sister was not available to so assist their mother." The second stated, "The encroachments of [the mother's] medical conditions were making it increasingly difficult for [the mother] to continue to live where she was living prior to her June 1996 move." The third one stated, "Mrs. Pang in fact took the June 1996 leave to help her mother move."

The Hospital argued, and the trial court agreed, that moving a parent under these circumstances was not caring for the parent under CalFRA.[5]

DISCUSSION

1. *Relevant CalFRA Provisions*

CalFRA grants employees the right to take up to 12 weeks of unpaid leave each year if needed due to the birth of a child, the employee's inability to work because of illness and, as relevant here, "to care for a parent or a spouse who has a serious health condition." (Gov. Code, § 12945.2, subd.

[5]Because we affirm on this ground, we need not consider issues relating to the adequacy of Pang's notification of her need for a family care leave.

(c)(3)(B).)[6] An employee entitled to such leave has the right to return to the same or a comparable position without loss of seniority or benefits. (§ 12945.2, subds. (f), (g).)

The term "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves either of the following: [¶] (A) Inpatient care in a hospital, hospice, or residential care facility. [¶] (B) Continuing treatment or continuing supervision by a health care provider." (§ 12945.2, subd. (c)(8).) Before granting leave, the employer is entitled to obtain a supporting certification from "the health care provider of the individual requiring care." (§ 12945.2, subd. (j)(1).) The certification is sufficient if it includes: "(A) The date on which the serious health condition commenced. [¶] (B) The probable duration of the condition. [¶] (C) An estimate of the amount of time that the health care provider believes the employee needs to care for the individual requiring the care. [¶] (D) A statement that the serious health condition warrants the participation of a family member to provide care during a period of the treatment or supervision of the individual requiring care." (§ 12945.2, subd. (j)(1)(A) - (D).) Administrative regulations of the Fair Employment and Housing Commission (the Commission) provide some guidance as to the last item of supporting information. The term " '[w]arrants the participation of the employee' " "includes, but is not limited to, providing psychological comfort, and arranging 'third party' care for the child, parent or spouse, as well as directly providing, or participating in, the medical care." (Cal. Code Regs., tit. 2, § 7297.0, subd. (a)(1)(D)(1).)

CalFRA has a federal law counterpart—the Family and Medical Leave Act of 1993. (29 U.S.C. §§ 2601-2654, hereafter FMLA; see *Marchisheck v. San Mateo County* (9th Cir. 1999) 199 F.3d 1068, 1073, hereafter *Marchisheck*.) The Commission has incorporated by reference the federal regulations interpreting the FMLA to the extent they are not inconsistent with CalFRA or other state laws. (Cal. Code Regs., tit. 2, § 7297.10.)

One such federal regulation defines when an employee is needed to care for a family member. (29 C.F.R. § 825.116 (1999).) That section states: "(a) The medical certification provision that an employee is 'needed to care for' a family member encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical,

---

[6]All further statutory references are to the Government Code unless otherwise indicated. CalFRA applies only to employers of more than 50 persons and only to employees who have been with their employer for at least 12 months and who worked at least 1,250 hours during the preceding year. (§ 12945.2, subds. (a), (c)(2)(A).)

hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care. [¶] (b) The term also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care, such as transfer to a nursing home.[7] [¶] (c) An employee's intermittent leave or a reduced leave schedule necessary to care for a family member includes not only a situation where the family member's condition itself is intermittent, but also where the employee is only needed intermittently—such as where other care is normally available, or care responsibilities are shared with another member of the family or a third party."

## 2. *Rules of Statutory Construction*

Since we are called upon to interpret a statute, the familiar rules of statutory construction apply. ▬ "The fundamental rule of statutory construction is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute ' "must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . ." ' . . . If the language of a statute is clear, we should not add to or alter it to accomplish a purpose which does not appear on the face of the statute or from its legislative history." (*Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1390-1391 [74 Cal.Rptr.2d 721], citations omitted.) Statutes must be harmonized, both internally and with each other. (*People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313].)

Although the Legislature delegated to the Commission the authority to promulgate rules specifying what constitutes a reasonable request for leave (§ 12945.2, subd. (a)), it did not do so in regard to the other provisions of CalFRA. Accordingly, while we will accord great weight and respect to the Commission's regulations that apply to the necessity for leave, along with

---

[7]Pang also argues she was needed to fill in for her sister, who was unable to help their mother move. Because we hold, *post*, that the circumstances of this case did not qualify for a CalFRA leave, Pang's reliance on this regulation is misplaced since her sister would not have been providing the requisite care either.

any applicable federal FMLA regulations that the Commission incorporated by reference, we still retain ultimate responsibility for construing CalFRA. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) ■ We interpret the language of administrative regulations by the same rules used to interpret statutes. (*Westfall v. Swoap* (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750].)

### 3. *Pang Was Not Caring for Her Mother Under CalFRA*

■ Pang's arguments, when condensed, are: Her mother's age and various medical conditions were making it difficult for the mother to live in a two-story home. In order for Pang's mother to remain independent and minimize her need for at-home assistance, the mother wanted to move to a one-level apartment. Because Pang's mother was physically unable to take part in the move, Pang was needed to help out. Pang's assistance with her mother's move therefore constituted "care" under CalFRA.

To support this contention, Pang relies on the federal regulations implementing the FMLA. She points to the provisions which state that an employee's need to care for a parent encompasses both physical and psychological care and includes situations where the employee may be needed "to make arrangements for changes in care, such as a transfer to a nursing home." (29 C.F.R. § 825.116(b) (1999).) Because her mother's move was intended to accommodate the mother's various medical conditions, Pang equates the move to a change in care, much like a transfer to a nursing home.

Even if the federal LMRA regulations could be interpreted as Pang suggests, they must give way if contrary to CalFRA.[8] Although CalFRA states that qualified employees may take leave to "care" for a parent, neither the statute nor any reported decisions have interpreted what qualifies as "care" under section 12945.2. After reviewing the terms of CalFRA and its legislative history, as well as the applicable administrative regulations, we conclude that Pang did not qualify for a CalFRA leave.

It is not enough that Pang's mother had a serious health condition.[9] Pang's participation to provide care for her mother had to be "warranted" during a "period of the treatment or supervision . . . ." (§ 12945.2, subd. (j)(1)(D).) The Commission's regulations define this to include "providing psychological comfort, and arranging 'third party' care for the child, parent or spouse,

---

[8]As discussed *post,* the Ninth Circuit's recent decision in *Marchisheck, supra,* 199 F.3d 1068, effectively eliminates this contention.

[9]We accept as true Pang's assertion that her mother had a serious health condition on the basis that she was receiving continuing treatment or supervision by a health care provider for her various ailments. (§ 12945.2, subd. (c)(8)(B).)

as well as directly providing, or participating in the medical care." (Cal. Code Regs., tit. 2, § 7297.0, subd. (a)(1)(D)(1).)

Although Pang's mother was under medical supervision for a variety of ailments at the time of her move, none had flared up into one of her periodic episodes of incapacity. Pang's admissions make clear that she was not there to directly, or even indirectly, provide or participate in medical care for her mother. Instead, she was there to help pack her mother's belongings and tell the movers where to place her mother's furniture. While Pang's presence may have provided her mother some degree of psychological comfort, this was merely a collateral benefit of activities not encompassed by the Commission's regulations. Apart from the reasons for the move, there was no exigency for it either. There was an offer on the house as of June 14, 1996, one week after the move. When the movers told Pang's mother they were available on June 7, she could have waited until after July 5, but chose not to.

The same is true of the federal FMLA regulations, which endorse family leave when the parent is unable to care for her own basic medical, hygienic, or other related needs (29 C.F.R. § 825.116(a) (1999)) or when there is a change in care, such as when a parent is transferred to a nursing home. (29 C.F.R. § 825.116(b).)

Pang's reliance on those regulations has been seriously undermined by the Ninth Circuit's recent decision in *Marchisheck, supra,* 199 F.3d 1068. The plaintiff in that case was the mother of a troubled teenager who had a history of emotional and behavioral problems, including a recent history of drug use. When the boy was beaten by some acquaintances, the mother sought leave under the FMLA to move her son to the Philippines in order to live with his uncle. The purpose of the move was to keep the boy safe from further beatings, not to seek medical or psychological treatment. In affirming the district court's grant of summary judgment for the employer, the Ninth Circuit assumed for discussion's sake that the son had a serious medical or psychological condition for purposes of the FMLA.[10] Although the mother was motivated by an understandable concern for her son's safety, 29 Code of Federal Regulations section 825.116 (1999) "involves some level of participation in ongoing treatment of that condition." (*Marchisheck, supra,* 199

---

[10]The *Marchisheck* decision made two alternative holdings. The first was that the plaintiff's son did not have a qualifying serious medical condition under the FMLA. (*Marchisheck, supra,* 199 F.3d at pp. 1074-1076.) The plaintiff in *Marchisheck* also sued under CalFRA, but the court's decision was based solely on its interpretation of the FMLA and its administrative regulations, in part because the plaintiff made no separate arguments under CalFRA. (*Id.* at p. 1073, fn. 2.) We rely on *Marchisheck* only to the extent it interpreted the FMLA and its companion regulations.

F.3d at p. 1076.) Because the mother was moving her son to a place where he would receive no treatment for his condition, she was not caring for him under the FMLA.

We sympathize with Pang's argument that her mother was moving on account of and in order to accommodate her various medical conditions.[11] Even so, she was not being placed in a nursing home and was not moving as part of a change in her care. The mother had never lived in a nursing home and had never hired a nurse to assist her at home. She was, by Pang's account, a fairly independent woman who, except when felled by one of her chronic ailments, could bathe, dress, cook, use the bathroom and even drive without assistance. The two-story home, with its flight of stairs and yardwork, had simply become too much for the mother to handle, prompting her move to an apartment. This did not involve a change in care. Instead, the move was designed so Pang's mother could continue in a living situation without care and treatment. For the same reasons, this was not a situation where Pang's mother was unable to care for her own basic medical, hygienic, or nutritional needs or safety, or was unable to transport herself to her doctor. (29 C.F.R. § 825.116(a) (1999).) Under *Marchisheck, supra,* 199 F.3d at page 1076, Pang did not take leave to care for her mother.

Pang argues for a more expansive reading of the CalFRA and FMLA regulations, pointing to language which states, in effect, that the types of care described are merely examples, not limitations. (See Cal. Code Regs., tit. 2, § 7297.0, subd. (a)(1)(D)(1) [" '[w]arrants the participation of the employee' includes, but is not limited to, providing psychological comfort . . . as well as directly providing, or participating in the medical care"]; 29 C.F.R. § 825.116(a) (1999) [the term " 'needed to care for' " "includes situations where, for example, . . ." the family member is unable to care for his or her own basic needs]; 29 C.F.R. § 825.116(b) [the term "needed to care for" "also includes" making arrangements for changes in care, such as transfer to a nursing home].)

While the language used is expansive, it is still subject to the rule of *ejusdem generis.* As such, the specific terms used control the general application of the regulations. (*County of Yolo v. Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1254 [7 Cal.Rptr.2d 647].) The CalFRA and FMLA regulations specifically refer to matters involving daily medical and personal care. Nothing in those regulations suggests an interpretation which would include a leave on the basis sought by Pang.

---

[11]We also sympathize with Pang's assertion that she was caring for her mother. Although Pang was caring for her mother in a practical sense, as set forth below, she was not doing so for purposes of CalFRA.

Finally, Pang contends that because CalFRA is part of the Fair Employment and Housing Act (§ 12900 et seq.) it must be construed broadly to encompass her claim. (§ 12993.) Although section 12993 provides for a liberal construction, it is tempered by the requirement that the statutes be liberally construed "for the accomplishment of the purposes of this part." (§ 12993, subd. (a).) Even a statute meant to be broadly interpreted may not be construed outside the scope of the Legislature's intent. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259-260 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on another point in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896-899 [12 Cal.Rptr.2d 728, 838 P.2d 250]; *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128, 1142-1143 [277 Cal.Rptr. 354].) The legislative history of CalFRA persuades us that its provisions cannot be stretched far enough to cover Pang.

When enacting CalFRA (originally known as the Family Rights Act of 1991), the Legislature made several findings in regard to the care of elderly parents. " 'Sec. 3. The Legislature further finds and declares all of the following: [¶] (a) The percentage of adults who care for their parents due to physical and mental disabilities is growing. Surveys indicate that about one-quarter of all workers must provide elder care support, and that 64 percent of senior Californians live with relatives. [¶] (b) Independent living situations are generally preferable to institutionalization as physical caretaking and emotional support are best performed by families. [¶] (c) The current trends towards home care, while providing for the health and well-being of families, adds to the tension between work demands and family needs. [¶] (d) Due to a lack of available and affordable care for elder persons, particularly in rural areas, and limited alternative housing arrangements, there is a need for care to be provided for elder persons by family members. [¶] (e) In the past, care for aged parents was provided principally by daughters. Today, a majority of women are in the work force and jeopardize their employment and career opportunities to provide this care. [¶] (f) The state, like the rest of the country, is experiencing dramatic demographic changes. Among the most significant of these changes is the growing number of elderly in our society. On the national level, more than 2.2 million family members provide unpaid help to ailing relatives, the most common caregivers being a child or spouse. About 38 percent of those caring for elderly relatives are children, and 35 percent are spouses. [¶] (g) One-fifth of Americans 65 years of age and older must receive home care or be confined to hospital or nursing homes. Facilitating care for them at home can present economic savings to the health system, seniors, caregivers, and employers.' " (Historical and Statutory Notes, 32D West's Ann. Gov. Code (1992 ed.) foll. § 12945.2, pp. 236-237.)

The Legislature's various references to "care" throughout its findings appear aimed at the kinds of hands-on, daily care needed to assist persons

struggling with a serious medical or psychological condition—administering various treatments and medications, preparing their meals, tending to their personal hygiene needs, taking them to their health care providers, and supplying the emotional comfort and support often needed to see a loved one through such trying circumstances. We do not believe that the caretaking services contemplated by CalFRA include helping a parent move to a new home under the circumstances involved in Pang's action.[12]

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent to recover its costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 12, 2000.

---

[12]We also wish to make clear that we are not so much defining what qualifies as "care" under CalFRA as we are stating what does not. Accordingly, our holding is limited to the narrow class of circumstances raised by Pang's claim.