Jenkins, J.
In these consolidated appeals, appellants ask us to reinstate their claims in which they seek declaratory and injunctive relief on the ground that respondents are allegedly violating sections 1 and *892 5 of article IX of the California Constitution.[1] Appellants' claims are general in nature. They allege the constitutional sections provide for a judicially-enforceable right to an education of "some quality" for all public school children, and, alternatively, that the Legislature is currently violating its constitutional obligations to "provide for" and "keep up and support" the "system of common schools" by its current educational financing system. However, we find no support for finding implied constitutional rights to an education of "some quality" for public school children or a minimum level of expenditures for education, as appellants urge us to read into sections 1 and 5 of article IX. To the contrary, the language of these constitutional sections do not include qualitative or funding elements that may be judicially enforced by the courts. Rather, the constitutional sections leave the difficult and policy-laden questions associated with educational adequacy and funding to the legislative branch. Consequently, we must affirm the trial court's dismissal of the complaints as appellants have failed to state a claim for which judicial relief may be accorded them.
FACTUAL AND PROCEDURAL BACKGROUND
The two lawsuits before us were deemed related but not consolidated in the trial court. In Campaign for Quality Education v. State of California (CQE ), plaintiffs are several nonprofit associations and guardians ad litem for minor students attending public schools in California, as well as one adult taxpayer and homeowner and two adult taxpayers and homeowners who are parents of students attending public schools in California. Similarly, in Maya Robles-Wong v. State of California (Robles-Wong ), plaintiffs are several nonprofit associations and guardians ad litem for several students attending public schools in California, as well as several California school districts. Intervener California Teachers Association filed a complaint-in-intervention in the Robles-Wong action. Defendants in each action are the State of California and various named persons sued in their official capacities as state officers.
In their operative complaints, all named plaintiffs and intervener (collectively appellants) seek declaratory and injunctive relief based, in pertinent part, on allegations that all named defendants (collectively respondents) are violating sections 1 and 5 of article IX. The overarching nature of the causes of actions sought to be reinstated are based on allegations that all public school children have a constitutional right to an education of "some quality," and, alternatively, that the Legislature is currently failing to meet its constitutional duty by employing an irrational educational funding scheme. According to appellants, the Legislature's current method of funding education fails to ensure that all public school children have the opportunity to become educationally proficient according to current legislatively-mandated academic standards.
Resolving respondents' separate demurrer and motion for judgment on the pleadings, the trial court sustained the demurrer and granted the motion for judgment on the pleadings, without leave to amend, as to those portions of the causes of action alleging that respondents are violating sections 1 and 5 of article IX. The court granted appellants the right to amend their complaints relative to other causes of action, but appellants declined to do so. Accordingly, the court entered judgments *893 dismissing the lawsuits in their entirety. Appellants' timely appeals ensued.[2]
DISCUSSION
I. Introduction
In ruling on a demurrer or motion for judgment on the pleadings, the trial court examines the pleading to determine whether it alleges facts sufficient to state a cause of action under any legal theory, with the facts being assumed true for purposes of this inquiry. (Committee for Green Foothills v. Santa Clara County Bd. of Supervisors (2010) 48 Cal.4th 32, 42, 105 Cal.Rptr.3d 181, 224 P.3d 920 (Committee for Green Foothills ); Pang v. Beverly Hosp., Inc . (2000) 79 Cal.App.4th 986, 989, 94 Cal.Rptr.2d 643.) Our review is de novo. (Committee for Green Foothills, supra, 48 Cal.4th at p. 42, 105 Cal.Rptr.3d 181, 224 P.3d 920 ; Schabarum v. California Legislature (1998) 60 Cal.App.4th 1205, 1216, 70 Cal.Rptr.2d 745 (Schabarum ).) "[W]e treat the properly pleaded allegations of [the] complaint as true, and also consider those matters subject to judicial notice. [Citations.]" (Alliance Mortgage Co. v. Rothwell (1995) 10 Cal.4th 1226, 1232, 44 Cal.Rptr.2d 352, 900 P.2d 601.) "[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. [Citation.] If there is any reasonable possibility that plaintiff can state a good cause of action, it is error and an abuse of discretion to sustain the demurrer without leave to amend. [Citations.] However, leave to amend is properly denied if the facts and nature of plaintiffs' claims are clear and under the substantive law, no liability exists. [Citations.]" (Beck v. County of San Mateo (1984) 154 Cal.App.3d 374, 379, 201 Cal.Rptr. 365.)
As noted, appellants limit their appeals to seeking reinstatement of those portions of the causes of actions that seek to impose liability on respondents for their alleged violations of sections 1 and 5 of article IX.[3] Appellants urge us to hold that their claims are justiciable in that if we were to remand the cases for trial, they would be able to demonstrate that the Legislature's current education finance system is in violation of the fundamental right to an education guaranteed by article IX, and, the legislative and executive branches of the state should be compelled to take "appropriate action under court supervision." However, even assuming the truth of the facts as alleged in the complaints, appellants have failed to state causes of action based on alleged violations of sections 1 and 5 of article IX by respondents.
II. Principles of Constitutional Interpretation
"[I]t is well established that it is a judicial function to interpret the law, *894 including the Constitution, and when appropriately presented in a case or controversy, to declare when an act of the Legislature or the executive is beyond the constitutional authority vested in those branches." (Schabarum, supra, 60 Cal.App.4th at p. 1213, 70 Cal.Rptr.2d 745.) We must " ' "enforce the provisions of our Constitution and 'may not lightly disregard or blink at ... a clear constitutional mandate.' " ' " (County of Riverside v. Superior Court (2003) 30 Cal.4th 278, 284-285, 132 Cal.Rptr.2d 713, 66 P.3d 718.) " 'It is within the legitimate power of the judiciary, to declare the action of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of non-action .' " (California State Employees' Assn. v. State of California (1973) 32 Cal.App.3d 103, 109, 108 Cal.Rptr. 60.) "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire lawmaking authority of the state, except the people's right of initiative and referendum is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the [L]egislature is authorized to do an act, but only to see if it is prohibited.' [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' " (Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 691, 97 Cal.Rptr. 1, 488 P.2d 161.)
In interpreting sections 1 and 5 of article IX, "our paramount task is to ascertain the intent of those who enacted it" by looking " 'to the language of the constitutional text ....' " (Thompson v. Department of Corrections (2001) 25 Cal.4th 117, 122, 105 Cal.Rptr.2d 46, 18 P.3d 1198.) We "cannot insert or omit words to cause the meaning of [the sections] to conform to a presumed intent that is not expressed. (Code Civ. Proc., § 1858[4] ; California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist . (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) 'As a judicial body, it is our role to interpret the [sections] as they are written.' [Citation.]" (Knight v. Superior Court (2005) 128 Cal.App.4th 14, 23, 26 Cal.Rptr.3d 687 (Knight ).)
III. Sections 1 and 5 of Article IX Do Not Provide A Qualitative Education Element
Appellants contend the language and history of sections 1 and 5 of article IX, and seminal judicial decisions declaring public education to be a fundamental right, lead to the inexorable conclusion that public school students have a judicially-enforcible constitutional right to an education of "some quality." After addressing certain preliminary matters, we conclude that *895 sections 1 and 5 of article IX do not provide for a education of "some quality" that may be judicially enforced by appellants.
First, there can be no doubt that the fundamental right to a public school education is firmly rooted in California law as it "has historically been accorded an ascendant position in this state. Indeed, at the very start, article IX of our 1849 Constitution created the office of Superintendent of Public Instruction; required the Legislature to encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement; required the Legislature to establish a system of common schools; and established a fund for the support of the common schools. (See Stats. 1849, p. 32.) ... Section 1 of article IX of the Constitution now provides, as it has since 1879: 'A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement.' Section 5 of article IX presently mandates, as it has since 1879: 'The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.' " (California Teachers Assn. v. Hayes (1992) 5 Cal.App.4th 1513, 1522, 7 Cal.Rptr.2d 699 (Hayes ).)
"The early case of Ward v. Flood (1874) 48 Cal. 36 [ (Ward ) ], considered the provisions of the Constitution of 1849 relative to educational affairs which, in all material respects, [are] similar to the present Constitution. The Supreme Court said: 'The opportunity of instruction at public schools is afforded the youth of the state by the statute of the state, enacted in obedience to the special command of the constitution of the state, directing that the legislature shall provide for a system of common schools, by which a school shall be kept up and supported in such district ..., etc. ( [A]rt. XIX, [former] [§] 3). The advantage or benefit thereby vouchsafed to each child, of attending a public school is, therefore, one derived and secured to it under the highest sanction of positive law. It is therefore, a right-a legal right -as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected and secured to the possessor.' ( [Ward , supra ,] 48 Cal. at p. 50, italics added; quoted in Piper v. Big Pine School Dist. (1924) 193 Cal. 664, 670 [226 P. 926].)" (Slayton v. Pomona Unified School Dist . (1984) 161 Cal.App.3d 538, 548-549, 207 Cal.Rptr. 705, fn. omitted.)
Second, there is no dispute that "our Constitution vests the Legislature with sweeping and comprehensive powers in relation to our public schools (Hall v. City of Taft [ (1956) ] 47 Cal.2d [177,] 179 [302 P.2d 574] ), including broad discretion to determine the types of programs and services which further the purposes of education ( [Hayes ,] supra , 5 Cal.App.4th at p. 1528 [7 Cal.Rptr.2d 699] )," and "such functions as educational focus, teaching methods, school operations, furnishing of textbooks and the like." (Wilson v. State Bd. of Educ . (1999) 75 Cal.App.4th 1125, 1134-1135, 89 Cal.Rptr.2d 745 (Wilson ); see California Teachers Assn. v. Board of Trustees (1978) 82 Cal.App.3d 249, 255, 146 Cal.Rptr. 850 ["the curriculum and the courses of study included in the common state curriculum are not prescribed by the Constitution, but are details left to the discretion of the Legislature," and "[t]hey do not constitute a part of the system, but are simply a function of that system"].) And, as appellants admit, the Legislature, *896 consistent with its constitutional authority, has addressed the quality of education to be afforded public school students. (See, e.g., Ed. Code, §§ 52052 -52052.9 [Public School Performance Accountability Program], 60640-60649 [California Assessment of Student Performance and Progress], 60851-60852.2 [High School Exit Examination].)
Third, we agree with the general proposition, embodied in Appellants' arguments, that an education of "some quality" accords with good public policy. However, the question in this case is not whether the concept of an education of "some quality" comports with good public policy. The question before us is whether the right to an education of "some quality" is enshrined, as a constitutional right, under sections 1 and 5 of article IX. Having properly framed the issue, we now analyze Appellants' claims under well-settled principles that guide our interpretation of the California Constitution.
At the outset we note that our Supreme Court has not addressed the issue raised by appellants-to wit, whether the right to an education of "some quality" is enshrined under sections 1 and 5 of article IX. Appellants ask to find that such a constitutional right is judicially enforceable based on the language in sections 1 and 5 of article IX, and as found by courts in other states that have analyzed constitutional provisions similar to article IX. However, as we now discuss, we conclude the language of sections 1 and 5, when read singly or together, in the context of article IX, does not provide for such an enforceable right, based on our constitutional language and persuasive decisions of other states that have analyzed almost identical constitutional language. (See Bonner v. Daniels (Ind. 2009) 907 N.E.2d 516, 520 (Bonner ); Committee for Educ. Equality v. State (Mo. 2009) 294 S.W.3d 477, 488 (Committee for Educ. Equality ). )[5]
The current sections 1 and 5 were adopted as part of the California Constitution of 1879. After section 1's "precatory introduction ... stressing the importance of knowledge and learning to the preservation of a free government," the remaining text of sections 1 and 5 imposes two duties on the Legislature. (Bonner, supra, 907 N.E.2d at p. 520.) The first is the duty to encourage the promotion of intellectual, scientific, moral and agricultural improvement by "all suitable means." ( [§ 1 ].) The second is the duty to provide for a system *897 of common schools by which a free school shall be kept up and supported in each district .... (§ 5.) Thus, section 1 "is general and aspirational," but makes no provision for how the Legislature is to achieve its goal except to use "all suitable means." (Bonner, supra, 907 N.E.2d at p. 520 ; see Committee for Educ. Equality, supra, 294 S.W.3d at p. 489 ["[t]he aspiration for a 'general diffusion of knowledge and intelligence' concerns policy decisions, and these political choices are left to the discretion of the other branches of government"].) Section 5 is "more concrete-the assignment of a specific task with performance standards" (Bonner, supra , 907 N.E.2d at p. 521 ), namely, to create "a system of common schools," "free," and "kept up and supported in each district." (§ 5.) But, section 5 does not "delineate or identify any specific outcome standards to be achieved by the [Legislature's] performance of its duty to provide for a system of common schools." (Bonner, supra , 907 N.E.2d at p. 521 ; see Kennedy v. Miller (1893) 97 Cal. 429, 432, 32 P. 558 ["[t]he term 'system,' " as used in article IX, section 5, "imports a 'unity of purpose as well as an entirety of operation, and the direction to the [L]egislature to provide "a" system of common schools means one system which shall be applicable to all the common schools within the state' "].) "As can be seen from the text of [sections 1 and 5, the] language speaks only of a general duty to provide for a system of common schools and does not require the attainment of any standard of resulting educational quality. The phrases ["a system of common schools," "free," and "kept up and supported in each district"] do not require or prescribe any standard of educational achievement that must be attained by the system of common schools." (Bonner, supra , at p. 521.) Thus, we find no explicit textual basis from which a constitutional right to a public school education of a particular quality may be discerned.
Appellants seemingly acknowledge the absence of textual support for the inchoate right to a quality education that they assert here. As such, they argue that sections 1 and 5, when read together in the context of article IX, support a finding of an "implicit" right to an education of "some quality." However, we are not at liberty to infer the existence of a constitutional right based on well-established principles of constitutional interpretation that counsel otherwise. As our Supreme Court explained in People ex rel. Brodie v. Weller (1858) 11 Cal. 77, 86 : "We do not ... approve of the principle of constitutional construction, which seeks by vague surmises, or even probable conjecture, or general speculation of a policy not distinctly expressed, to control the express language of the instrument; since such mode would not unfrequently change the instrument from what its framers made it, into what Judges think it should have been. Chief Justice Marshall, in Gibbons v. Ogden , ( [ (1824) 22 U.S. 1,] 9 Wheat. 1 [6 L.Ed. 23] ) ) speaking of the federal constitution, says '[the framers], and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said [id . at p. 188 ];' " and, earlier, in Sturges v. Crowninshield (1819) 17 U.S. 122, 4 Wheat. 122, 4 L.Ed. 529, Chief Justice Marshall says "although the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words" (17 U.S. at p. 202, 4 Wheat. at p. 202 ). And, more recently, in Washington v. Glucksberg (1997) 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772, the high court, in addressing the contours of a federal constitutional substantive due process claim, said that "[b]y extending constitutional protection *898 to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field' [citation], lest the liberty protected ... be subtly transformed into the policy preferences of the members of this Court [citation]." (Id . at p. 720, 117 S.Ct. 2258.) Consequently, as these decisions instruct, we reject Appellants' invitation to glean, through surmise or speculation, an implicit right to educational adequacy from these sections. We hasten to add that our interpretation of sections 1 and 5 of article IX flows not only from the language of article IX itself, but from a consideration of its purpose. (See Lungren v. Davis (1991) 234 Cal.App.3d 806, 825, 285 Cal.Rptr. 777 ["in construing the meaning of the constitutional provisions at issue, we must consider their purposes"].) " 'The proper province of a declaration of rights and constitution of government, after directing its form, regulating its organization and the distribution of its powers, is to declare great principles and fundamental truths, to influence and direct the judgment and conscience of legislators in making laws, rather than to limit and control them, by directing what precise laws they shall make.' " (Ward, supra, 48 Cal. at p. 55.) Sections 1 and 5 are "precisely of this character" (Ward, supra, at p. 55 )-the sections declare "great principles and fundamental truths" (ibid . ) but do not mandate the Legislature to act in a particular manner regarding what precise laws shall be made to implement these principles and truths. (See Clausing v. San Francisco Unified School Dist. (1990) 221 Cal.App.3d 1224, 1236-1237, 271 Cal.Rptr. 72.) "We decline [appellants'] invitation to amplify the words and meaning of our Constitution as crafted by its framers and approved by its ratifiers." (Bonner, supra , 907 N.E.2d at p. 522.)[6]
We conclude our discussion here with the views expressed by the Illinois Supreme Court, in Committee for Educ. Rights v. Edgar (Ill. 1996) 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (Committee for Educ. Rights ),[7] when rejecting a claim *899 similar to the one appellants assert here: "It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion. [¶] To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in [the State]. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence. We certainly do not mean to trivialize the views of educators, school administrators and others who have studied the problems which public schools confront. But nonexperts-students, parents, employers and other[s]-also have important views and experiences to contribute which are not easily reckoned through formal judicial fact-finding. In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives." (220 Ill.Dec. 166, 672 N.E.2d at p. 1191 ; see also Wells v. One2One Learning Foundation (2006) 39 Cal.4th 1164, 1213, 48 Cal.Rptr.3d 108, 141 P.3d 225 (Wells ) [an allegation that "seeks to raise issues of the quality of education," and "the academic results produced," falls "within the rule that courts will not entertain claims of 'educational malfeasance' "]; Serrano v. Priest (1976) 18 Cal.3d 728, 748, 135 Cal.Rptr. 345, 557 P.2d 929 ["[q]uality cannot be defined wholly in terms of performance on statewide achievement tests because such tests do not measure all the benefits and detriments that a child may receive from his educational experience"].)
IV. Sections 1 and 5 of Article IX Do Not Provide For A Minimum Level of Educational Expenditures
In seeking reinstatement of their complaints, appellants alternatively posit that regardless of their educational adequacy argument, they can demonstrate the Legislature's current allocation of funds for the legislatively-mandated education of public school children fails to comply with article IX. As a remedy for the purported failure, appellants seek a declaration declaring that the Legislature's current allocation of funds does not provide an adequate education for all public school students, and an order compelling the Legislature to implement an education financing system that complies with the constitutional right to an education under court supervision . We conclude that appellants are not entitled to the requested relief as they cannot show that the constitutional provisions they invoke restrict legislative discretion in allocating *900 funds for the education of public school children.
An overview of California's educational financing scheme, as established by legislation and interpreted by the courts, is helpful to our analysis of Appellants' funding claim. "Under the state Constitution, the Legislature is obligated to provide for a public school system. (Cal. Const., art. IX, § 5 ; Wells [, supra ,] 39 Cal.4th [at p.] 1195 [48 Cal.Rptr.3d 108, 141 P.3d 225].) Seeking to promote local involvement, the Legislature established school districts as political subdivisions and delegated to them that duty. (Wells , [supra ,] at p. 1195 [48 Cal.Rptr.3d 108, 141 P.3d 225] ; Butt v. State of California (1992) 4 Cal.4th 668, 680-681 [15 Cal.Rptr.2d 480, 842 P.2d 1240] ; see also [Hayes, supra ,] 5 Cal.App.4th [at p.] 1523 [7 Cal.Rptr.2d 699].) Historically, school districts were largely funded out of local property taxes. (Serrano v. Priest (1971) 5 Cal.3d 584, 592 [96 Cal.Rptr. 601, 487 P.2d 1241] (Serrano I ); Serrano v. Priest [, supra ,] 18 Cal.3d [at pp.] 737-738 [135 Cal.Rptr. 345, 557 P.2d 929] (Serrano II ); see County of Los Angeles v. Sasaki (1994) 23 Cal.App.4th 1442, 1450 [29 Cal.Rptr.2d 103].) Under the California system of financing as it existed until the 1970's, different school districts could levy taxes and generate vastly different revenues; because of the difference in property values, the same property tax rate would yield widely differing sums in, for example, Beverly Hills and Baldwin Park. (Serrano I, at pp. 592-594 [96 Cal.Rptr. 601, 487 P.2d 1241].)" (California Redevelopment Assn. v. Matosantos (2011) 53 Cal.4th 231, 243, 135 Cal.Rptr.3d 683, 267 P.3d 580 (Matosantos ).)
In Serrano I and Serrano II, our Supreme Court invalidated the 1970's system of education financing, "holding that education was a fundamental interest (Serrano I, supra , 5 Cal.3d at pp. 608-609 [96 Cal.Rptr. 601, 487 P.2d 1241] ; Serrano II, supra , 18 Cal.3d at pp. 765-766 [135 Cal.Rptr. 345, 557 P.2d 929] ) and that financing heavily dependent on local property tax bases denied students equal protection (Serrano I , at pp. 614-615 [96 Cal.Rptr. 601, 487 P.2d 1241] ; Serrano II, at pp. 768-769, 776 [135 Cal.Rptr. 345, 557 P.2d 929] ). The Serrano decisions threw 'the division of state and local responsibility for educational funding' into ' "a state of flux." ' (Los Angeles Unified School Dist. v. County of Los Angeles (2010) 181 Cal.App.4th 414, 419 [104 Cal.Rptr.3d 590].) In their aftermath, a 'Byzantine' system of financing ( [Hayes, supra, 5 Cal.App.4th at p. 1525 [7 Cal.Rptr.2d 699] ] ) evolved in which the state became the principal financial backstop for local school districts. Funding equalization was achieved by capping individual districts' abilities to raise revenue and enhancing state contributions to ensure minimum funding levels. (Lockard, In the Wake of Williams v. State: The Past, Present, and Future of Education Finance Litigation in California (2005) 57 Hastings L.J. 385, 388-398 ; see generally Wells [, supra, ] 39 Cal.4th at p. 1194 [48 Cal.Rptr.3d 108, 141 P.3d 225] [discussing current funding regime].)" ( *901 Matosantos, supra , 53 Cal.4th at pp. 243-244, 135 Cal.Rptr.3d 683, 267 P.3d 580.)
Thereafter, in 1978, the voters adopted Proposition 13 (Cal. Const., art. XIII A, added by Prop. 13, as approved by voters, Primary Elec. (June 6, 1978)), which "capped ad valorem real property taxes imposed by all local entities at 1 percent (Cal. Const., art. XIII, § 1, subd. (a)), reducing the amount of revenue available by more than half (Stark, The Right to Vote on Taxes (2001) 96 Nw.U.L.Rev. 191, 198 ). In place of multiple property taxes imposed by multiple political subdivisions, it substituted a single tax to be collected by counties and thereafter apportioned. (Cal. Const., art. XIII A, § 1, subd. (a).)" (Matosantos, supra , 53 Cal.4th at p. 244, 135 Cal.Rptr.3d 683, 267 P.3d 580.) "Proposition 13 transformed the government financing landscape in at least three ways .... First, by capping local property tax revenue, it greatly enhanced the responsibility the state would bear in funding government services, especially education. [Citations.] Second, by failing to specify a method of allocation, Proposition 13 largely transferred control over local government finances from the state's many political subdivisions to the state, converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants. [Citations.] Third, by imposing a unified, shared property tax, Proposition 13 created a zero-sum game in which political subdivisions (city, counties, special districts, and school districts) would have to compete against each other for their slices of a greatly shrunken pie." (Matosantos , supra , at pp. 244-245, fn., 135 Cal.Rptr.3d 683, 267 P.3d 580 omitted.)
"In 1988, the voters added another wrinkle with Proposition 98, which established constitutional minimum funding levels for education and required the state to set aside a designated portion of the General Fund for public schools. (Cal. Const., art. XVI, § 8 ; see Los Angeles Unified School Dist. v. County of Los Angeles, supra , 181 Cal.App.4th at p. 420 [104 Cal.Rptr.3d 590] ; [Hayes, ] supra , 5 Cal.App.4th at pp. 1517-1518 [7 Cal.Rptr.2d 699].) Two years later, the voters revised and effectively increased the minimum funding requirements for public schools. (Prop. 111, as approved by voters, Primary Elec. (June 5, 1990), amending Cal. Const., art. XVI, § 8 ; see County of Sonoma v. Commission on State Mandates (2000) 84 Cal.App.4th 1264, 1289 [101 Cal.Rptr.2d 784].)" (Matosantos, supra , 53 Cal.4th at p. 245, 135 Cal.Rptr.3d 683, 267 P.3d 580.) With this background in mind, we now turn to an analysis of Appellants' funding claim.
As previously stated, appellants assert that the California Constitution mandates that the Legislature appropriate funds for education that are sufficiently adequate to provide all public school students with an equal opportunity to meet proficiency standards currently set by the Legislature. In the Serrano decisions, our Supreme Court determined that the courts were competent to decide whether or not the Legislature's distribution of state funds for education was consistent with the equal protection of the law provisions of the State constitution. (Serrano II, supra , at pp. 768-769, 776, 135 Cal.Rptr. 345, 557 P.2d 929 ; Serrano I, supra , 5 Cal.3d at pp. 614-615, 96 Cal.Rptr. 601, 487 P.2d 1241.) Appellants argue that the declaratory and injunctive relief they seek is "precisely the type of relief" authorized by our Supreme Court in its Serrano decisions. We find no support for Appellants' argument in the Serrano decisions. To the contrary, our Supreme Court made clear in Serrano I that there is no constitutional mandate for the Legislature "to provide funds for each child in the State at some magic level to produce either an adequate-quality educational program or a high-quality educational program." (Serrano v. Priest (1977) 20 Cal.3d 25, 36, fn. 6, 141 Cal.Rptr. 315, 569 P.2d 1303 [describing the decision in Serrano I ]; see also Serrano I, supra , at p. 596, 96 Cal.Rptr. 601, 487 P.2d 1241 ["article IX, section 5 makes no reference to school financing"].)[8] Appellants eschew *902 that they are seeking a court directive compelling the Legislature to provide for "a magic level" or any specific level of educational funds. "Functionally, however," their funding claim would require this court to impose its "judgment over that of the Legislature in order to determine whether a particular policy benefits public education." (Woonsocket Sch. Comm. v. Chafee (R.I. 2014) 89 A.3d 778, 793.) Thus, unlike the Serrano decisions on which appellants rely, allowing Appellants' funding claim to proceed would require the courts to intrude into the Legislature's appropriation powers, which we decline to do. (See Grossmont Union High School Dist. v. State Dept. of Education (2008) 169 Cal.App.4th 869, 889, 86 Cal.Rptr.3d 890 (Grossmont ) ["[u]nder the California Constitution, the judiciary has no general authority to compel appropriations or second-guess legislative spending decisions"].)
We conclude our discussion here by "emphasiz[ing] that the Legislature's power over our public school system is plenary, subject only to constitutional restraints. [Citations.]" (Wilson, supra , 75 Cal.App.4th at p. 1134, 89 Cal.Rptr.2d 745.) Thus, Appellants' assertion "that the Legislature is not providing enough funding for [education] is not a basis for a lawsuit." (Grossmont, supra , 169 Cal.App.4th at p. 886, 86 Cal.Rptr.3d 890 ; see California School Bds. Assn. v. State of California (2011) 192 Cal.App.4th 770, 798, 121 Cal.Rptr.3d 696 ["[t]he formulation of a budget bill, including the items to be placed in the bill, is inherently a discretionary and legislative power," and "[t]he budget determination is 'limited by [the Legislature's] discretion, and beyond the interference of courts' "]; id . at p. 799, 121 Cal.Rptr.3d 696 ["[t]he California Constitution's separation of powers doctrine forbids the judiciary from issuing writs that direct the Legislature to take specific action, including to appropriate funds and pass legislation"].) Appellants raise "a public policy claim, 'properly resolved ... in the halls of the Legislature.' " (Grossmont, supra , at p. 892, 86 Cal.Rptr.3d 890.)
V. Conclusion
We agree wholeheartedly with appellants that the provision of a quality education for all public school students is an important goal for society as it ensures full participation in our constitutional democracy. Nonetheless, we must deny their request to reinstate those portions of their complaints' causes of action based on alleged violations of sections 1 and 5 of article IX. When read singly or together, sections 1 and 5 of article IX evince no constitutional mandate to an education of a particular standard of achievement or impose on the Legislature an affirmative duty to provide for a particular level of education expenditures. Our decision is consistent with the "rules of constitutional interpretation, which require that constitutional limitations and restrictions on legislative power ' " 'are to be construed strictly, and are not be extended to include matters not covered by the language used.' " ' [Citation.] Under these principles, there is no basis for applying [sections 1 and 5 of article IX] as an equitable remedy to cure the perceived unfairness resulting from political decisions on funding priorities,"
*903 (City of San Jose v. State of California (1996) 45 Cal.App.4th 1802, 1816-1817, 53 Cal.Rptr.2d 521 ), or to "delineate or identify any specific outcome standards to be achieved by [the Legislature's] performance of its duty to provide for a system of common schools" (Bonner, supra, 907 N.E.2d at p. 521 ). In the absence of a challenge to any legislative enactment, we conclude sections 1 and 5 of article IX, standing alone, do not allow the courts to dictate to the Legislature, a coequal branch of government, how to best exercise its constitutional powers to encourage education and provide for and support a system of common schools throughout the state.[9] Because sections 1 and 5 of article IX do not impose on the Legislature any duties that can be judicially enforced, there is no reason for a judicial evaluation as to whether there has been a breach of those alleged duties.[10] Even if the matter were remanded for a trial, appellants would not be entitled to the declaratory and injunctive relief requested in their pleadings. "The quandary described in the complaint[s] is lamentable, but the remedy lies squarely with the Legislature, not the judiciary." (Grossmont, supra , 169 Cal.App.4th at p. 892, 86 Cal.Rptr.3d 890.) Accordingly, we affirm the judgments of dismissal in favor of respondents.[11]
DISPOSITION
The judgments of dismissal are affirmed. Defendants and respondents are awarded costs on appeal.
I concur:
Siggins, J.

All further unspecified references to sections and articles refer to the California Constitution.

In addition to the briefs filed by the parties, we have considered amici curiae briefs, in support of Appellants' position, filed by Education Law Center and Campaign for Educational Equity, Teacher's College, Columbia University; Delaine Eastin and Jack O'Connell; Fight Crime: Invest in Kids California; Children Now, Education Trust-West & California Association of School Business Officials; and Maria Medina and Californians Together.

Thus, we find that appellants have abandoned any challenge to the following trial court rulings: (1) dismissal of those portions of the causes of actions alleging equal protection violations (art. I, § 7(a)& (b); art. IV, § 16); and (2) dismissal of those portions of the cause of action alleging violations of article IX, section 6 [school financing], and alleging that "the State has failed to meet the requirement[s] of [a]rticle XVI, [s]ection 8(a), that '[f]rom all state revenues there shall first be set apart the monies to be applied by the State for support of the public school system.' "

Code of Civil Procedure section 1858 reads: "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted, and where there are several provisions or particulars, such a construction is, if possible, to be adopted, as will give effect to all."

"In determining the meaning of a constitutional provision it will be presumed that those who framed and adopted it were conversant with the interpretation which had been put upon it under the constitution from which it was copied, and this is the rule even as to provisions taken from the constitutions of other states,-the judicial construction placed upon them in the states from which they are taken will be followed by the courts in the state which adopts them." (Lord v. Dunster (1889) 79 Cal. 477, 485, 21 P. 865.) In Bonner, the court analyzed the language in the Education Clause, Article 8, Section 1, of the Indiana Constitution of 1851, which reads: " 'Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools , wherein tuition shall be without charge, and equally open to all.' " (Bonner, supra, 907 N.E.2d at p. 520.) In Committee for Educ. Equality, the court analyzed the language in Article IX, section 1(a), of the Missouri Constitution of 1875, which reads: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of [21] years as prescribed by law." (Committee for Educ. Equality v. State, supra, 294 S.W.3d at p. 488.)

We see no significance to Appellants' arguments based on isolated portions of the debates during the Constitutional Convention of 1879. If the constitutional language is "not ambiguous," as in this case, " ' "not even the most reliable document of [constitutional] history ... may have the force of law." [Citation.]' [Citation.]" (Knight, supra , 128 Cal.App.4th at p. 23, 26 Cal.Rptr.3d 687.) It is only "[i]f doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid." (State Board of Education v. Levit (1959) 52 Cal.2d 441, 462, 343 P.2d 8.)
We also find distinguishable Hartzell v. Connell (1984) 35 Cal.3d 899, 201 Cal.Rptr. 601, 679 P.2d 35 (Hartzell ), cited by appellants. In Hartzell, our Supreme Court found that a school's imposition of fees for extracurricular activities violated the "free school" guarantee in section 5 of article IX because the activities, although not required for graduation, constituted an integral component of public education. (Id . at pp. 909-913, 201 Cal.Rptr. 601, 679 P.2d 35.) However, the court did not find that the constitution required such extracurricular activities had to be provided by a public school. The court held only that "[o]nce the community has decided that a particular educational program is important enough to be offered by its public schools, a student's participation in that program [could not] be made to depend upon his or her family's decision whether to pay a fee or buy a toaster," and "[t]he constitutional defect in [imposing] such fees [could] neither be corrected by providing waivers to indigent students, nor justified by pleading financial hardship." (Id . at pp. 912, 913, 201 Cal.Rptr. 601, 679 P.2d 35.)

In Committee For Educ. Rights, the court analyzes the language in section 1 of article X of the Illinois Constitution of 1970, which reads, in pertinent part: " 'A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities. [¶] The State shall provide for an efficient system of high quality public educational institutions and services .... [¶] The State has the primary responsibility for financing the system of public education. ( [Italics] added.)' " (Committee For Educ. Rights, supra, 220 Ill.Dec. 166, 672 N.E.2d at p. 1183.)

Consequently, we reject Appellants' reliance on our Supreme Court's general observation in Serrano I that "surely the right to an education today means more than access to a classroom." (5 Cal.3d at p. 607, 96 Cal.Rptr. 601, 487 P.2d 1241.) Serrano I neither addressed nor found a constitutional mandate imposing on the Legislature a duty to fund an education of "some quality" that appellants seek to enshrine in articles I and 5 of article IX. "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court." (Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd . (1999) 19 Cal.4th 1182, 1195-1196, 81 Cal.Rptr.2d 521, 969 P.2d 613.) "General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (Gomes v. County of Mendocino (1995) 37 Cal.App.4th 977, 985, 44 Cal.Rptr.2d 93.)

We note that appellants do not seek leave to amend their complaints. They ask us only to uphold allegations that the State is violating sections 1 and 5 of article IX, standing alone and untethered to any challenge to legislative enactments.

And, accordingly, we do not need to articulate a judicial standard to be applied by the trial court to determine whether the Legislature is providing an education of "some quality" to all public school children.

" 'Strictly speaking, a general demurrer is not an appropriate means of testing the merits of the controversy in a declaratory relief action because plaintiff is entitled to a declaration of his rights even if it be adverse.' [Citations.] However, 'where the issue is purely one of law, if the reviewing court agreed with the trial court's resolution of the issue it would be an idle act to reverse the judgment of dismissal for a trial on the merits. In such cases the merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute the declaration of the legal rights and duties of the parties concerning the matter in controversy.' [Citations.]" (Herzberg v. County of Plumas (2005) 133 Cal.App.4th 1, 24, 34 Cal.Rptr.3d 588.) Because we have resolved Appellants' demurrers and motion for judgment on the pleadings, as matters of law, "[t]he object[s] of the declaratory relief actions [are] served by our opinion that" appellants have failed to state causes of actions against respondents based on alleged violations of sections 1 and 5 of article IX, and accordingly, no remand is necessary. (Teresi v. State of California (1986) 180 Cal.App.3d 239, 245, fn. 4, 225 Cal.Rptr. 517 ; see Savient Pharmaceuticals, Inc. v. Department of Health Services (2007) 146 Cal.App.4th 1457, 1464, 53 Cal.Rptr.3d 689.) In light of our determination, we do not need to separately address the parties' other arguments.